```
 1                IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION


 3

       UNITED STATES OF AMERICA,    :
 4                                  :
            Plaintiff,              :
 5                                  :
                                    : CASE    8:15-cr-410-T-27
 6     vs.                          : NO.:    TBM
                                    :
 7                                  : DATE:   07/15/2016
       OMAR ZEIDAN ZEIDAN,          :
 8                                  : TIME:   9:30 a.m.
            Defendant.              :
 9     -------------------------     PAGES:  1 - 108


10


11                 TRANSCRIPT OF SENTENCING
          BEFORE THE HONORABLE JAMES D. WHITTEMORE
12             UNITED STATES DISTRICT JUDGE


13

       For the Plaintiff:
14
               CHRISTOPHER F. MURRAY, ESQ.
15             United States Attorney's Office
               Suite 3200
16             400 N. Tampa Street
               Tampa, Florida 33602
17
       For the Defendant:
18
               FRANK W. ZAREMBA, ESQ.
19             Federal Public Defender's Office
               Suite 2700
20             400 N. Tampa Street
               Tampa, Florida 33602
21


22     Court Reporter:  Lynann Nicely, RPR, RMR, CRR
               Official Court Reporter
23             801 N. Florida Avenue, 13B
               Tampa, Florida 33602
24
       Proceedings recorded and transcribed by
25     computer-aided stenography.
```

1              P R O C E E D I N G S

2            THE COURT:  Good morning, we're here for

3    sentencing in the matter of United States vs. Omar

4    Zeidan Zeidan.  Let's get the appearances.  For the

5    government?

6            MR. MURRAY:  Chris Murray for the United

7    States, Your Honor, and to my left is Justin Jerale,

8    a special agent with the DEA.  Good morning.

9            THE COURT:  Good morning.  For the defendant?

10           MR. ZAREMBA:  Good morning, Your Honor, Frank

11    Zaremba on behalf of Mr. Zeidan Zeidan who is

12    present in the court.

13           THE COURT:  Good morning.  Let's have the

14    interpreter sworn, please.

15           [Interpreters sworn]

16           INTERPRETER 1:  For the record my name is

17    Margo Dobgui, D-O-B-G-U-I.

18           INTERPRETER 2:  My name is Khadija,

19    K-H-A-D-I-J-A, the last name is D-R-H-O-U-R-H-I.

20           THE COURT:  Do we have two interpreters,

21    Mr. Zaremba?

22           MR. ZAREMBA:  Apparently we do, Your Honor.

23           THE COURT:  All right.  Mr. Murray, when was

24    your expert report available?

25           MR. MURRAY:  Your Honor, it's been at least a

1       week or so, Your Honor.  I apologize not knowing the

2       exact date, I'm in the middle of trial and I can't

3       recall the exact date.

4              THE COURT:  More specifically, when was it

5       filed?  It hasn't been filed, correct?

6              MR. MURRAY:  The slide presentation, Your

7       Honor?

8              THE COURT:  I don't know what's on the slide

9       presentation.  I'm talking about the expert report.

10      Dr. Fang; is that right?

11             MR. MURRAY:  Yes, Your Honor, we provided the

12      opinion to defense counsel and put notice that we

13      were going to call him as a witness.  I did not

14      intend to admit the report as an exhibit.

15             THE COURT:  Let me stop for just a moment.  I

16      haven't seen it, is my point.  Did I miss it?

17             MR. MURRAY:  No, Your Honor, what we intend to

18      present today is a summary of that report through a

19      slide presentation which we've marked as Government

20      Exhibit 1 and we've provided a copy to --

21             THE COURT:  So there is no written report from

22      Dr. Fang?

23             MR. MURRAY:  There is a written report, Your

24      Honor.  My intent was to present it through the

25      summary presentation.

1          THE COURT:  In the future file the written

2    reports of experts so the court has an opportunity,

3    in fairness to myself, to at least be aware of the

4    nature of the opinions and the background and the

5    professional credentials of the witness.  It would

6    save a lot of time if you do that and that's the

7    customary practice.  I have spent a substantial

8    amount of time reading through Mr. Zaremba's expert

9    report.  I don't have the benefit of the

10   government's.  So that's a bit frustrating for me.

11   I like to be prepared.

12        MR. MURRAY:  I apologize, Your Honor, I wasn't

13   thinking -- I thought of proceeding through this

14   hearing in a different way, Your Honor.  I apologize

15   to the court, Your Honor.

16        THE COURT:  We are here for sentencing.  I

17   have received and reviewed the presentence report

18   prepared by the United States Probation Office.  The

19   record in this case should reflect that pursuant to

20   a plea agreement the defendant -- if I go too fast,

21   Madam Interpreter, please speak up.

22        I was about to say he pled guilty pursuant to

23   a plea agreement to Count One of the indictment in

24   which he's charged with possession with intent to

25   distribute, and I'll spell this out in capital

1       letters, AB-FUBINACA.  His guilty plea has been

2       accepted and he has been adjudicated guilty of that

3       offense.

4            Mr. Zaremba, you've reviewed the presentence

5       report with your client?

6            MR. ZAREMBA:  I have, Your Honor.

7            THE COURT:  The addendum indicates the

8       government has no unresolved objections to the

9       report or the application of the guidelines; is that

10      correct, Mr. Murray?

11           MR. MURRAY:  Yes, Your Honor.

12           THE COURT:  And there is a single objection,

13      Mr. Zaremba, on behalf of the defendant?

14           MR. ZAREMBA:  That is correct, Your Honor.

15           THE COURT:  And I have read your sentencing

16      memorandum.  I don't see a 5K1.1.  Mr. Murray, that

17      has not yet been filed?

18           MR. MURRAY:  That is correct, Your Honor,

19      there is no motion on behalf of this defendant.

20           THE COURT:  Let me ask the two of you to

21      proceed efficiently.  I don't intend to prolong this

22      matter based on a nuance in the United States

23      Sentencing Guidelines that may or may not have any

24      impact on the sentence I impose in this case.  The

25      guidelines are not binding on this court; they're an

1      important consideration, of course, but I just want

2      you to proceed efficiently.  Mr. Murray, it is your

3      burden, is it not?

4              MR. MURRAY:  Yes, Your Honor.

5              THE COURT:  All right.  Call your first

6      witness, please.

7              MR. MURRAY:  The United States calls Dr. Li

8      Fang.

9              THE COURT:  Come on up, Dr. Fang.  I more or

10     less skipped a point in this.  Mr. Zaremba, I've

11     read your objections and sentencing memos so I know

12     the issues, I should say.  You are contesting the

13     application of the guidelines to this particular

14     substance, are you not?

15             MR. ZAREMBA:  I am, Your Honor.

16             THE COURT:  And that involves both the ratio

17     that probation has recommended as well as some of

18     the chemical features of the substances.  So the

19     burden is on the government to establish by a

20     preponderance of the evidence the basis on which the

21     guidelines should apply, correct?

22             MR. ZAREMBA:  Yes, Your Honor.

23             THE COURT:  All right.  Please raise your

24     right hand and be sworn.

25             [Witness sworn]

1          COURTROOM DEPUTY CLERK:  Please be seated.

2     Please state your name and spell your last name for

3     the record.

4          THE COURT:  Is Dr. Dudley present,

5     Mr. Zaremba?

6          MR. ZAREMBA:  He is, Your Honor.

7          THE COURT:  I'll ask both witnesses to be sure

8     to testify in a manner that the interpreters can

9     follow.  Sometimes we have to speak a little slower

10    than normal and they have my authority to interrupt

11    any of us if we get ahead of them.  We're

12    translating from English to Arabic, correct?

13         MR. ZAREMBA:  That is correct, Your Honor.

14         THE COURT:  Thank you.  Go right ahead,

15    Mr. Murray.

16         COURTROOM DEPUTY CLERK:  Please state your

17    name and spell your last name for the record.

18         THE WITNESS:  My name is Li Fang.  First name

19    L-I.  Last name Fang, F-A-N-G.

20                   DIRECT EXAMINATION

21    BY MR. MURRAY:

22    Q     Who do you work for?

23    A     I work for Drug Enforcement Administration,

24    DEA.

25    Q     How long have you been with the DEA?

1    A        Since April 2010.

2    Q        What is your position?

3    A        My title is drug science specialist.

4    Q        Can you summarize for the court your

5    educational background?

6    A        I got my medical degree in China in 1986.

7    Then I did my surgical residency at the University

8    Hospital at Capital Medical University in Beijing,

9    China.  After that I was surgical oncology fellow

10   for a year.  Starting from 1991 to 1994 I was

11   attending physician at the same university hospital.

12            I started my Ph.D. graduate program in 1985 at

13   the University of Texas medical branch at Galveston,

14   Texas, and I was a Ph.D. degree at that institution

15   in 2000.

16   Q        Are you familiar with the controlled substance

17   XLR-11?

18   A        Yes.

19   Q        Are you familiar with the controlled substance

20   AB-FUBINACA?

21   A        Yes.

22   Q        Have you testified concerning those

23   substances?

24   A        Yes.

25   Q        Are you familiar with the United States

1          Sentencing Guidelines with regard to unlisted drugs?

2      A      Yes.

3      Q      And XLR-11 and AB-FUBINACA are both unlisted

4  drugs, correct?

5      A      Correct.

6      Q      Based on your training and experience, do you

7  have an opinion as to which is the most closely

8  related guidelines listed substance to XLR-11 and

9  AB-FUBINACA?

10     A      Correct.

11     Q      What substance is that?

12     A      Delta9-THC.

13     Q      THC?

14     A      THC.

15     Q      You have in front of you what has been marked

16  for identification purposes as Government Exhibit 1.

17  Do you recognize that?

18     A      Yes.

19     Q      What is that?

20     A      It's a slide presentation to talk about

21  pharmacology related to this substance.

22     Q      It summarizes the pharmacological effects of

23  XLR-11 and AB-FUBINACA, correct?

24     A      Yes.

25     Q      Did you prepare this presentation?

1     A       Correct.

2             MR. MURRAY:   The United States moves to admit

3     Government Exhibit 1, Your Honor, a copy of which

4     has been provided to defense and the court.

5             THE COURT:   Is there any objection?

6             MR. ZAREMBA:   No, Your Honor.

7             THE COURT:   Exhibit 1 is received.

8     BY MR. MURRAY:

9     Q       Dr. Fang, I'm showing you page 2 of this

10    exhibit.   It's labeled Cannabinoids.   Can you

11    summarize this for the court?

12    A       Yes.   When I was assigned this task, I had to

13    look at what is the substance of XLR-11 and

14    AB-FUBINACA, what they are.   So I found that they

15    are both chemically named cannabinoid substance.   So

16    the cannabinoid is initially, it's active substance

17    found in the marijuana plant.   So those cannabinoids

18    majorly have psychoactive effects and other

19    pharmacological properties on the central nervous

20    system.   Primarily Delta9THC or THC is the major

21    ingredient in the marijuana plants and the major

22    cause of psychoactive effects such as euphoria, mood

23    change, psychosis and other adverse health effect or

24    toxic effect of the consumer -- the drug user

25    consumed.

1    Q        Moving to page 3, this is labeled Cannabinoid

2    Receptors.

3    A        Yes.  So why they call it cannabinoid because

4    the cannabinoid-like substance working on the

5    protein structure on the neural cells, this protein

6    structure called CB1 or Cannabinoid Receptor 1, and

7    so far in the science community they found two kinds

8    of CB receptors, they called CB1 and CB2.

9            The CB1 receptor is majorly involved

10   psychoactive effects because the CB1 receptor

11   majorly was found in the neural cell or neurons of

12   the central nervous system.  Like I mentioned

13   before, THC is the principal psychoactive chemical

14   compiled binds to and activates the CB1 receptor so

15   that when the user use that kind of substance, the

16   CB1 receptor will be activated by those substance

17   and they change the user's mood, perception to the

18   environment, psychosis, euphoria, and other related

19   physiological or psychological effects.

20   Q        We're on page 4.  Does this summarize this?

21   A        Yes, this slide show how the drug cannabinoid

22   work on the human brain.  So when the drug user use

23   the substance from whatever route -- smoke,

24   whatever, injection -- and the substance is absolved

25   through the blood to the brain and working on the

1    brain, cause the effect.  And these drugs based on

2    the study like cannabinoid working on the receptor

3    CB1 and neurons and they change their communication

4    between the neuron and other brain cells.  So that

5    cause the marijuana high effect.

6    Q      We're looking now at page 5 of your slide

7    show.  At the upper right-hand corner it has a

8    reference to THC, XLR-11 and AB-FUBINACA.  What is

9    that, why are they --

10   A      I use the picture to show that how the CB1

11   receptor working.  Like I mentioned about this one,

12   we see there is -- this is a cell membrane.  This is

13   -- the blue one in the middle, the two layer it

14   looks like membrane on the neural cells.  And this

15   is a Y-shaped with the blue square, it called CB1

16   receptor.  And then they have particular structure

17   integrate on the membrane.  [Inaudible] have ligands

18   working on the receptor is like the key to insert

19   the lock.  I mention here ligand is the purple one,

20   it's like THC, XLR-11, AB-FUBINACA.  And then when

21   those substance bonding on the receptors, they will

22   change the chemical downstream.  We call the second

23   message system [inaudible] cell then the cells will

24   change.

25   Q      I'm going to skip ahead to slide 12.  Doctor,

1        this references Binding Studies Results (in vitro).

2        What does that mean?

3        A        When we look at all of the available central

4        information, we found that the XLR-11 and

5        AB-FUBINACA working bonding to the CB1 receptor just

6        like Delta9 THC.  And this study show that in

7        several peer-reviewed publication like I mentioned

8        here.  So we know that XLR-11, AB-FUBINACA working

9        on CB1 receptor just like the key can use in the

10        lock specifically.  So they have a similar bonding

11        study result just like THC and it can cause

12        pharmacological action downstream.  There are

13        several peer-reviewed studies confirm this state.

14        Then I confirmed that XLR-11, AB-FUBINACA, and

15        THC working on the same CB1 receptor in the dish

16        cell [inaudible] setting.  They are not working on

17        opiate receptor, working on [inaudible] so they

18        specifically working on the CB1 receptor just like

19        Delta9 THC.  In vitro means in dish, cell dish.

20        Q        You mentioned peer-reviewed studies.  I'm

21        showing you page 13.

22        A        Yeah.  Another study would want to know when

23        those XLR-11 and AB-FUBINACA working on that CB1

24        receptor, do they activate the CB1 or they inhibit

25        that.  So this study called the in vitro cell

1    functional study, this is well established in the

2    science community of drug abuse.  So the study

3    showed that both XLR-11 and AB-FUBINACA activate the

4    CB1 receptor, similar to Delta9 THC.  And the data

5    also show that they have equally potent based on

6    this study.  And then there are several studies

7    published in the peer-reviewed publication confirm

8    that.  So both XLR-11 and AB-FUBINACA, just like

9    Delta9 THC, working and active on CB1 receptor.  Not

10   working on other opiate receptor, not on other

11   serotonin receptor.  So this study confirmed

12   [inaudible] bonding study.

13   Q       I move to page 15.  What is a drug

14   discrimination study?

15   A       Well, in the science community of drug abuse

16   the drugs transmission is well established and this

17   used animal most of the written study.  The user

18   study predict that no drugs have abuse potential and

19   many, many peer-reviewed study show that the drug

20   [inaudible] study rodent either in mice or in rats

21   as quantitatively and qualitatively [inaudible] to

22   subjective effect in humans.  So basically as a

23   scientist use the rodent to give the animal drugs

24   and for a period of time the animal will push this

25   button because the drugs cause the animal to like

1    it, similar like euphoric effect in human.  So there

2    is two level the drugs will know that which drugs

3    they like, which they are not.  Like this model, the

4    scientist use THC to train animals.  For a little

5    while the rats will know which level he will like it

6    so he will push the button, push the lever of the

7    THC, not the control one.  And then after scientist

8    inject animal with XLR-11, [inaudible] no drugs.  So

9    to detect how to [inaudible] if the animal still

10   push the similar button just like that with the THC.

11   Q       Skipping ahead to slide 18, can you summarize

12   the significance of those?

13   A       Yes, based on this study, peer-reviewed study

14   that showed that [inaudible] both XLR-11 and

15   AB-FUBINACA have the similar psychoactive effect

16   just like Delta9 THC.

17   Q       We're on page 19, synthetic cannabinoids.

18   A       Yeah.  Another part of the result I reviewed

19   and analyzed is I found there are so many

20   peer-reviewed studies show that XLR-11 and

21   AB-FUBINACA to cause serious toxic effect and

22   [inaudible] effect based on the central nervous

23   effect, so when the user use that, it cause

24   paranoia, hallucination, convulsion, headache --

25   Q       Let me stop you there.  There is two columns

1    of adverse health effects and you've reviewed many

2    peer-reviewed studies that have shown that XLR-11

3    and AB-FUBINACA have those results, correct?

4    A    That's correct.  And THC cause the similar

5    effect.  Some users, they will die.  So this study

6    show that about synthetic cannabinoid including

7    XLR-11 and AB-FUBINACA cause serious health effect

8    and sometimes death.

9    Q    That's summarized on page 21; is that correct?

10   A    Yes.  This is a study published in the New

11   England Journal of Medicine, says XLR-11 and

12   AB-FUBINACA, there are so many cases, you know,

13   hundreds, hundreds people use that, were sent to the

14   ER, in the hospital, in ICU.  Next slide?

15   Q    Doctor, hold on for a second.  So there is no

16   human study trials being done, correct?

17   A    Due to the safety concern there is no

18   well-controlled human study.

19   Q    What's well-controlled mean?

20   A    Well, [inaudible] if you know the drugs have

21   some particular medical benefits in animals, you

22   want to move to the market, you want to get

23   [inaudible], you have to show that you have

24   well-controlled human study show that the medical

25   benefit over the risk.

1    Q       So given those concerns, there is not human

2    testing but there is information being provided by

3    doctors from emergency rooms from the data that they

4    see; is that correct?

5    A       Correct.

6    Q       That's summarized in part on pages 22 and 23,

7    correct?

8    A       Yes.

9    Q       In fact, your data goes on all the way for

10   many pages with data reported on human subjects from

11   emergency rooms and other medical professionals,

12   correct?

13   A       Correct.

14   Q       That's data on the impact of XLR-11 and

15   AB-FUBINACA and similar substances, correct?

16   A       Correct.

17   Q       Move down to page 38.  Could you summarize for

18   the court why you reached the conclusion you

19   testified to at the beginning that XLR-11 and

20   AB-FUBINACA have pharmacological effects that are

21   substantially similar to THC.  Could you explain to

22   the court why you reached that conclusion?

23   A       Yeah.  Based on all the available information,

24   [inaudible] cell study, functional study, animal

25   studies, and many, many peer-reviewed studies, the

1    [inaudible] and death report, so both XLR-11 and

2    AB-FUBINACA have pharmacological effects including

3    hallucinating, depression, stress on the central

4    nervous system that are substantially similar to

5    that of Delta9-THC.  And based on the drug

6    discrimination study XLR-11 and AB-FUBINACA are at

7    least as potent if not more potent than Delta9-THC.

8    Q      Why isn't it just the same as marijuana?

9    A      Well, the study found that there is more than

10   300 active ingredients in the marijuana.  So we

11   don't know which particular substance in marijuana

12   working on the central nervous system.  But

13   Delta9-THC we know that they have the effect on the

14   CNS so we compare XLR-11 and AB-FUBINACA.

15   Q      So in marijuana there is many, many compounds,

16   correct?

17   A      Correct.

18          MR. MURRAY:  Pass the witness, Your Honor.

19          THE COURT:  Cross examination, Mr. Zaremba?

20                    CROSS EXAMINATION

21   BY MR. ZAREMBA:

22   Q      Good morning, Doctor.

23   A      Good morning.

24   Q      You're employed by the Department of Justice?

25   A      Correct.

1    Q        You're employed by the Drug Enforcement

2    Administration?

3    A        Correct.

4    Q        And your job is to provide litigation support

5    for the DEA?

6    A        My job is to review the pharmacology of

7    substance and [inaudible] product with a potential

8    -- abuse potential, yeah.

9    Q        All right.  So your job is not involved

10   necessarily with the other aspects of DEA; is that

11   accurate to say?

12   A        Can you specific what other aspects?

13   Q        I'm sorry, I couldn't hear you.

14   A        Could you specify what other aspects you

15   mentioned in other?

16   Q        What you basically just described as your job

17   is to do research on drugs.

18   A        Correct.

19   Q        And that's your sole job?

20   A        Major job, yeah.

21   Q        And what are your other duties?

22   A        Pardon me?

23   Q        What are your other duties besides that?

24   A        Like this one, I provide support for the

25   court, I was asked give an opinion.

1    Q       And that's an important part of your job.

2    A       I think so.

3    Q       Yesterday you provided us with a number of

4    references for your report.

5    A       Yeah, I provide reference list.

6    Q       And did you read those references?

7    A       Almost all.

8    Q       Pardon me?

9    A       Yes.

10   Q       And did you find any factual inaccuracies in

11   those references?

12   A       What?

13   Q       Factual inaccuracies, was there something

14   wrong with the reports?

15   A       No.

16   Q       So you found them to all be sufficient for

17   your purposes?

18   A       Yeah, all the references in that [inaudible]

19   is scientifically sound, written by experts in their

20   corresponding field.

21   Q       I'm sorry, I didn't -- I apologize, I didn't

22   quite get that.

23   A       So your question this about the reference in

24   the reference list?

25   Q       Yes.

1    A        Yeah, so yeah, I read all them, so I provide,

2    they support my opinion based on all that study

3    result listed in that reference.

4    Q        All right.  You referred to the in vivo

5    studies involving mice and rats.  How many of those

6    did you reference?

7    A        I think at the top of the mice there is a

8    Wiley study that, and there is another one is Gatch

9    and Forster are both professors in the University of

10   North Texas to use the drugs [inaudible] published.

11   Q        And both were done with rodents.

12   A        Correct.

13   Q        And in the one study I believe the Texas study

14   it was done with six rats?

15   A        I don't remember correct was a particular

16   number.  Can you bring the paper?

17   Q        No, I don't.  It's in your reference though,

18   so that's --

19   A        I don't remember a particular number because

20   there is statistics on that on why scientists pick

21   up that number.

22   Q        So there's some number rats.  Were there any

23   controls?

24   A        Yes.

25   Q        There are control rats?

1    A       Well, yeah, I think so.

2    Q       All right.  You didn't -- both these studies

3    were commissioned by DEA?

4    A       Which particular one?

5    Q       The two you referred to, I believe Gatch and

6    Wiley.

7    A       Well, there is many studies in Gatch.

8    Q       But as to the in vitro research as to the

9    cannabinoids and THC.

10   A       Which in vitro?  I present two in vitro

11   studies.  There is a binding studies, there is a

12   functional study.  Which one are you specifically

13   point at?

14   Q       The one you were using in your slide show.

15   A       Can we go back to the slides?

16   Q       If I can figure out how to operate it, yes.

17   We're looking at page 15 it looks like Drug

18   Discrimination Studies.

19   A       So you mentioned about the in vitro.  Right

20   now we talk about in vivo.  That's two different

21   types of study.  I don't know which one you want to

22   talk about.  This is an in vivo, not in vitro, sir.

23   Q       I used the wrong term, I apologize.  I used in

24   glass instead of in life.  All right.  I apologize.

25   Let's go to this one though, the in life one.  This

1      is the one that was done with rodents.

2      A      This is a simple.  We can move to next because

3      that's the particular study -- this I want to show

4      how the study carry out.

5      Q      All right.  But the purpose of these studies

6      was to show if there was a -- if the cannabinoids

7      would be similar to THC.

8             THE COURT:  The effects you're talking about,

9      the effect?

10            MR. ZAREMBA:  Your Honor, I don't think that

11     can be discerned from the rodents.

12            THE COURT:  Well, I'm trying to follow your

13     question.

14     BY MR. ZAREMBA:

15     Q      This diagram you used that you testified to is

16     based -- let's narrow it down -- on how many

17     studies?

18     A      Well, there is two studies peer-reviewed.

19     Q      Two studies.  Two peer-viewed studies.

20     A      To show -- we talk about XLR-11, so one paper

21     shows XLR-11 on nice, [inaudible] 2013 by Wiley at

22     RTI, I believe so.  The second in my -- if you

23     review my written list another one is Professor

24     Gatch in University of Texas they use rats.  That

25     test XLR-11 and AB-FUBINACA.

1    Q       And on the basis of these tests you determined

2    that it's substantially similar -- AB-FUBINACA and

3    XLR-11 are substantially similar to THC or

4    marijuana?

5    A       I comprehensively all the study not only this

6    one.  This is one of the components of my scientific

7    evidence.

8    Q       All right.  But this is the one you're

9    presenting.

10   A       Yeah.

11   Q       Okay.  So I want to talk about the one you're

12   presenting.  And what is described in this, the rats

13   or mice were trained to differentiate between saline

14   and THC; is that correct?

15   A       Correct.

16   Q       And it was injected into them?

17   A       Yes.

18   Q       It wasn't used -- there was an -- it could

19   have been inhaled into the rodents, but that wasn't

20   done; is that correct?

21   A       Can you repeat one more time?

22   Q       It could have been inhaled?

23   A       What's mean inhaled?

24   Q       Inhaled.

25   A       You mean smoke?

1    Q       Smoke, yes.  That could have been done, but

2    that was not done in this test.

3    A       Well, I believe this study didn't -- I'm not

4    aware in the animal studies in mice and in rats use

5    the route of inhale or smoking.

6    Q       Isn't that routinely done by tobacco

7    companies?

8    A       By what company?

9    Q       Tobacco companies.

10   A       I don't know tobacco.  I'm not working in the

11   tobacco science.

12   Q       We'll move on.  And you don't know the number

13   of rats or mice that were involved in this

14   experiment -- these two experiments you're referring

15   to.

16   A       Yeah, like mentioned one use mice by

17   [inaudible] group.  Another one use rats at

18   University of North Texas group.

19   Q       Doctor, would you agree that cocaine and

20   nicotine are not substantially similar drugs?

21   A       Well, I was asked to review this substance.  I

22   didn't particular say cocaine and -- what was the

23   substance you mentioned?

24   Q       Nicotine and cocaine.

25   A       Could you repeat one more question?

1    Q       Would you agree that nicotine and cocaine

2    would not be substantially similar?

3    A       Similar on what?

4    Q       In terms of their reaction.

5    A       Reaction on what reaction?

6    Q       Central nervous system.

7    A       What reaction?  To water, to air, or to

8    particular thing?  I don't understand you mentioned

9    about that.

10   Q       You don't understand it.  This test is

11   designed to test the effects on the central nervous

12   system; is that accurate?

13   A       There is many, many function on the central

14   nervous system.  You have to be specific, which

15   effect.

16   Q       What was that test designed to do?

17   A       It's called the drug discrimination study.

18   Q       And what was it designed to do?

19   A       It's designed to test no drugs have some

20   similar effect to the others.

21   Q       So would you then -- would you agree or

22   disagree that cocaine and nicotine might have

23   similar effects?

24           THE COURT:  Mr. Zaremba, you're going to

25   confuse me.  What is the relevance of that line of

```
 1      questioning?

 2           MR. ZAREMBA:  Your Honor, there are four other

 3      tests that have been done using the same method that

 4      found the rats making the -- not being able to

 5      distinguish the difference between nicotine,

 6      cocaine, cocaine and Wellbutrin, amphetamine and

 7      cocaine, LSD and MDMA.  I'm just going to the meta

 8      aspect of this experiment.  But I can move on, Your

 9      Honor.

10           THE COURT:  Well, I'm going to ask and suggest

11      that you do because that really has nothing to do

12      with the issue before me.  Unless you believe it

13      goes to the weight of Dr. Fang's opinion and the

14      reliability of the studies on which he is relying.

15           MR. ZAREMBA:  I have nothing further of this

16      witness, Your Honor.

17           THE COURT:  Mr. Murray, any redirect?

18           MR. MURRAY:  No, Your Honor.

19           THE COURT:  Dr. Fang, I need to ask you a

20      couple questions and if my questions are not

21      articulate, feel free to correct me.  I did not hear

22      in your testimony any opinion concerning the

23      chemical structure of XLR-11, AB-FUBINACA, and THC

24      in terms of similarities.  Am I correct that I did

25      not hear that.
```

1              THE WITNESS:  Correct.

2              THE COURT:  Thank you, sir.

3              THE WITNESS:  I'm working on pharmacology, not

4      a chemist.

5              THE COURT:  I'm sorry?

6              THE WITNESS:  I'm a pharmacologist working on

7      pharmacology, not a chemist.

8              THE COURT:  Thank you.  Anything else,

9      Mr. Murray, Mr. Zaremba?

10             MR. MURRAY:  No, Your Honor.

11             THE COURT:  Thank you sir, you may step down.

12     Please watch your step.

13             Anything else, Mr. Murray?

14             MR. MURRAY:  No, Your Honor.

15             THE COURT:  Mr. Zaremba?

16             MR. ZAREMBA:  I would call Dr. Dudley, Your

17     Honor.

18             [Witness sworn]

19             COURTROOM DEPUTY CLERK:  Please be seated.

20     Please state your name and spell your last name for

21     the record.

22             THE WITNESS:  Gregory Dudley, D-u-d-l-e-y.

23                      DIRECT EXAMINATION

24     BY MR. ZAREMBA:

25     Q      Good morning, Dr. Dudley.

1    A       Good morning.

2    Q       You told the court your name.  Could you tell

3    the court your occupation?

4    A       I'm currently the Eberly Distinguished

5    Professor and department chair at West Virginia

6    University in Morgantown.  That position only took

7    effect last week.

8    Q       In your report we provided the court with a

9    copy of your CV and that indicated that you were

10   currently employed at Florida State.

11   A       Yes, and that was accurate at the time of that

12   CV.  Again, the new position just took effect on

13   July 9th.

14   Q       Again, you're the chair of the department and

15   it's an endowed chair?

16   A       There are two positions.  I'm the chair of the

17   department and in that capacity I'm responsible for

18   the department management.  I am also an endowed

19   research chair and that is to support my research

20   program.

21   Q       Prior to that -- let me ask you real quick,

22   what is your research program?  That may save time.

23   A       My research program is in chemistry.  More

24   specifically I work on the chemistry of drugs and

25   drug-like substances.  We work on the synthesis of

1    drug-like substances, not drugs per se, not

2    compounds that are already on the market or already

3    out and available, but more drug-like substances

4    that might become future drugs.  We work on the

5    synthesis of those compounds, we work on developing

6    new technology to prepare drug-like substances, and

7    we worked in collaboration with others to help move

8    those substances closer to the pharmaceutical drug

9    discovery process.

10    Q       And your duties at FSU were what?

11    A       At Florida State I was -- I still am a

12    professor of chemistry and biochemistry in that

13    capacity.  I was also an associate chair of the

14    department which included some leadership and

15    management responsibilities.

16         My primary responsibilities related to

17    research and teaching in mostly organic chemistry.

18    I taught classes at the undergraduate and graduate

19    level including introductory chemistry, organic

20    chemistry, and then at the graduate level courses

21    more specialized in organic synthesis and tools for

22    probing biological functions.

23         I also directed a research program and

24    provided hands-on instruction for graduate students,

25    undergraduate students, and postdoctoral scholars in

1        the research lab.

2                I also had or still have a graduate faculty

3        status is he Florida A&M University in Tallahassee

4        in their College of Pharmacy and Pharmaceutical

5        Sciences where I serve on graduate committees for

6        their Ph.D. students.

7        Q        Pharmaceutical studies?

8        A        Yes.

9        Q        Your education -- I understand you went to

10       Florida State?

11       A        I went to Florida State for undergraduate,

12       yes.

13       Q        You got your Ph.D. from MIT?

14       A        Yes.

15       Q        You did your post-doc work where?

16       A        I did my post-doctoral studies at the Memorial

17       Sloan Kettering Cancer Center in New York.   More

18       specifically I was in their molecular pharmacology

19       and chemistry program as a NIH -- National

20       Institutes of Health -- postdoctoral fellow.

21       Q        In your duties do you serve on peer review

22       committees?

23       A        I provide peer review services for a number of

24       different agencies, journals, funding agencies.   In

25       some cases that peer review service is provided

1      anonymously on an ad hoc basis.   In other cases

2      there is a committee and in that case I would serve

3      on a committee.   In any case that peer review

4      process is anonymous to the person or persons whose

5      work is being reviewed.

6      Q       What does this mean, peer review?

7      A       The peer review process is one of the

8      gatekeepers in scientific funding and publication.

9      When someone, for example, wants to publish an

10     article in a peer reviewed journal, they will

11     complete the study, write up their manuscript, and

12     submit that manuscript to the journal for

13     publication.   Prior to the editors of the journal

14     making a decision, they will sent that manuscript

15     out to people in the community that they regard as

16     experts in the field for those people to provide a

17     critical review of the manuscript of the study, make

18     sure that the study has the appropriate significance

19     and that the study was conducted in accord with the

20     scientific method and that the conclusions are

21     supported by the data.   The peer reviewers provide a

22     report which then the editor takes into

23     consideration while making final publication

24     decisions.

25             There is an analogous process involved at

```
 1        funding agencies when they're making decisions

 2        whether or not to fund a research proposal, they

 3        will solicit critical feedback from experts in the

 4        field.

 5    Q        Do you do that?

 6    A        I do that, yes.

 7    Q        You do consulting work?

 8    A        I also consult, yes, I've been called upon to

 9        consult on a number of occasions by pharmaceutical

10        companies, smaller biotech companies.

11    Q        And who funds your research?

12    A        My research at present is funded by the

13        National Science Foundation.  Over the course of my

14        career I've received funding from the National

15        Science Foundation, from the National Institutes of

16        Health, from a number of private non-profit funding

17        agencies, as well as from some pharmaceutical

18        companies, largely in the form of fellowships either

19        for myself or for research students.  And Florida

20        State University also has supported my research.

21    Q        Have you ever been qualified to give opinion

22        testimony in the area of medicinal chemistry and

23        drug science in federal courts of the United States?

24    A        Yes.

25    Q        On roughly how many occasions?
```

1    A        I have appeared in court to testify -- in

2    federal court on roughly 15 or 16 or so occasions.

3    Q        And on how many occasions have you appeared in

4    the Middle District of Florida as an expert?

5    A        It's approximately five or six, half dozen or

6    so.

7            MR. ZAREMBA:  Bear with me, Your Honor, I'm

8    trying to figure out Mr. Murray's computer.

9    Q        Doctor, you reviewed Dr. Fang's report?

10   A        I reviewed his slides, I've reviewed a number

11   of reports that you'd sent to me, yes.

12   Q        Did you find anything in his reports that gave

13   you some pause for concern?

14   A        Yes.

15   Q        I'm showing you page 5 which is on the

16   computer screen, I believe it's in front of you.

17   A        Yes.

18   Q        Can you speak to this?

19   A        Yes.  This is a cartoon representation of the

20   cannabinoid receptor, noting the cannabinoid

21   receptor as a cellular machinery that spans the

22   membrane.  There is an outside receptor portion that

23   can bind to ligands and depending on how ligands

24   bind to the receptor on the outside, in this cartoon

25   there is a cellular response that is observed.

1          In practice it's -- this is an

2    oversimplification.  In practice there are different

3    types of cellular responses that can occur in

4    response to different types of ligands that bind.

5    As a basic diagram teaching tool I think it's

6    appropriate, but we need to recognize that it is an

7    oversimplification, with the important point being

8    that different ligands will provoke different types

9    of cellular responses or adjust the cellular

10   response will change depending on which ligand is

11   binding.

12   Q       Would that depend on their shape?

13   A       That would depend on the nature of the

14   molecular interaction between the ligand and the

15   receptor on the outside of the cell and that

16   molecular interaction will depend on the shape of

17   the molecule and it will depend on the different

18   features of the molecule that will engage in

19   binding.

20   Q       The primary oversimplification in this diagram

21   would simply be the shape of the --

22   A       One of the oversimplifications is that the

23   ligand is represented as a singular shape binding to

24   a singular shape of the receptor.  We know as a

25   matter of fact that Delta9-THC, XLR-11, and

1    AB-FUBINACA all have different shapes, different

2    structures, and as an extension of that it is most

3    logical to infer that they will bind to the receptor

4    in different ways and very conceivably might provoke

5    or promote different types of cellular responses

6    upon binding.  It's known that they all bind to the

7    receptor, but it is not known exactly how they bind

8    and most reasonably, most probably they do not and

9    cannot bind equivalently.

10   Q      So while this is an aid, it's just a very

11   general aid.

12   A      That's right.

13   Q      I'm showing you page 10 of the report.  Could

14   you tell me if this analysis follows the scientific

15   method?

16   A      It's close.  Words like "predictive" under the

17   conclusions are not words that we would use in the

18   scientific method.  I think what that is meant to

19   say is hypothesis, that one -- if we're interested

20   in the effects on the central nervous system of a

21   drug or drug-like substance on the human users, you

22   could use data from in vitro studies to formulate a

23   hypothesis regarding the effects in human users.  So

24   I think where it says "predictive" what that means

25   is that you could use that data to form a hypothesis

1      about effects on human users.

2      Q      So it's would just be getting you to the first

3      level of what you're doing is a hypothesis.

4      A      Yes, if you are interested ultimately in the

5      effects on the central nervous system in human

6      users, you would start that inquiry by studying the

7      effects of the substance in human cells, that would

8      fall into the category A, or in purified proteins

9      would be in category A, to see if it bind to a

10     particular protein.  And then based on those

11     preliminary experiments you might then formulate a

12     hypothesis as to how it might act in the human user.

13     Q      So what I'm understanding from your testimony,

14     this would just be at the very beginning of the

15     process and it would be a very broad tool?

16     A      Yes.

17     Q      It would not be something that would be

18     dispositive of an issue.

19     A      You wouldn't use data from an in vitro study

20     to form a conclusion regarding effects in a human

21     user.  You would use data from the an in vitro study

22     to form a conclusion regarding performance in that

23     particular study -- interaction with a particular

24     protein, for example.

25     Q      So again, it's at the very beginning of the

1      process.

2      A      Yes.

3      Q      Now, I ask you to take a look at page 14, In

4      Vitro Functional Studies.  This is a statement that

5      was used in the report to help come to the opinion

6      of Dr. Fang; is that correct?

7      A      That's my understanding, that the opinion of

8      Dr. Fang was supported by the content of these

9      slides.

10     Q      What if anything is incorrect about this

11     statement?

12     A      Delta9-THC is not a full agonist of the CB1

13     receptor.  So the statement, "Similar to Delta9-THC,

14     XLR-11, and AB-FUBINACA are full agonists of the CB1

15     receptor."  XLR-11 and AB-FUBINACA each have been

16     characterized and are appropriately characterized as

17     full agonists of the CB1 receptor.  Deltaa9-THC is

18     categorized as a partial agonist.

19     Q      Why is that important?

20     A      There are difference ways in which cells

21     respond to external stimuli.  Ligands bind to the

22     receptor and the cell responds accordingly.  This is

23     how cells communicate, this is how cells respond to

24     their stimuli.  There are different types of

25     cellular responses, signals based on the stimuli.

1    An external stimuli might cause a cell to fire off a

2    signal, it might -- a full signal, it might cause a

3    cell to turn off a signal, it might cause a cell to

4    modulate a signal to a medium level and these

5    different types of cellular responses are discussed

6    and characterized in terms of an agonist.  A full

7    agonist is something that will perturb the cellular

8    response by activating the signal.  An inverse

9    agonist will perturb the cellular response by

10   turning the signal all the way off.  A partial

11   agonist will modulate the signal towards a sort of

12   medium level.

13       So there are examples, cases, for instance,

14   where something that might a partial agonist in

15   certain cases might act more like by turning the

16   signal off.  If the signal was supposed to be on, it

17   might dial the signal back.

18       These are different mechanisms by which drugs,

19   whether they're medicines or drugs of abuse,

20   different mechanisms by which drugs can alter our

21   biochemistry.  And THC being a partial agonist has a

22   different -- its mechanism of action is categorized

23   differently compared to a full agonist.

24       THE COURT:  What is the effect of that in

25   terms of the human?

1          THE WITNESS:  In terms of the human, these

2     drugs will alter our biochemistry, it will change a

3     particular cell signaling pathway.  It may be that

4     there is a pathway that is over firing and we want

5     to dial it back, or there is a pathway that isn't

6     turning on appropriately and we want to turn it on.

7     This is part of the drug discovery challenge, part

8     of the drug discovery process.

9          In this particular case whatever it is --

10    whatever signal is produced upon binding to the

11    external cannabinoid receptor, the full agonist will

12    turn that signal all the way on; the partial agonist

13    will modulate it to a lower level of the signal,

14    sort of high beam headlights versus daytime running

15    lights versus headlights off kind of thing.

16         THE COURT:  Does that -- do I understand

17    correctly then that whether or not it's a full or

18    partial agonist will impact on the effect, the

19    psychotropic effect on the human?

20         THE WITNESS:  Whether or not it's a full

21    agonist or a partial agonist, there will be

22    different -- these are different cellular responses.

23    It is believed that those types of cellular

24    responses then translate ultimately to the effects

25    in human users.  That would be the hypothesis and i

1     would be reasonable hypothesis.  But again, these

2     types of studies are done in a more controlled,

3     simplified environment of a pure protein or a single

4     cell.  So you would take this observation that one

5     has -- one is a partial agonist, one is a full

6     agonist, and you could formulate a hypothesis one

7     way or the other regarding the effects in human

8     users, but then you'd want to do that experiment in

9     order to draw the conclusion.

10         THE COURT:  Is that why you conclude that

11    there is no substance listed in the guidelines that

12    is substantially similar to AB-FUBINACA or XLR-11 in

13    its effects on the central nervous system?

14         THE WITNESS:  That those two substances,

15    XLR-11 and AB-FUBINACA, have a different mechanism

16    of action in the cell studies is important to my

17    opinion that they are not substantially similar.

18    Failing that, it would have been harder to draw a

19    conclusion because we're talking about effects in

20    the human central nervous system that haven't been

21    carefully studied.

22         THE COURT:  All right.  Thank you.  Go ahead,

23    Mr. Zaremba, sorry to interrupt.

24    BY MR. ZAREMBA:

25    Q    I'll have you look at page 15, what I was

1    discussing with Dr. Fang.   What does this page

2    denote?

3    A       This page shows or is a representation of the

4    drug discrimination studies where rodents -- in this

5    case rodents are trained to get their food by

6    pressing a particular pellet if they're feeling the

7    effects in this case of THC, or to get their food

8    from a different pellet or from a different bar if

9    they are not feeling the effects of THC, if they're

10   getting saline.   So once they learn where to get

11   their food, depending on whether or not they're

12   feeling THC effect or placebo effects.

13   Q       Is this a very broad form of experiment?

14   A       Yes, this is a subjective effects experiment

15   that gives us the ability to put drug substances

16   into broad categories.   For example, might

17   categorize them as stimulant or as a hallucinogen

18   very broadly, or in the case of THC or marijuana in

19   a cannabinoid type of effects.

20   Q       So this study could not indicate at all

21   whether it was a substantially similar drug to THC?

22   A       The term "substantially similar" is the legal

23   term and that substantially similar bar allows

24   substance to be treated as approximately equal under

25   the law.   So no, a drug discrimination study would

1    not give you that level of refinement, it doesn't

2    establish the effects to that level of refinement.

3    Q       In fact, as I questioned Dr. Fang on, the same

4    format or studies has been shown to have rats or

5    mice choose nicotine and cocaine.

6    A       That's correct.  Nicotine and cocaine can both

7    be classified as stimulants in part because a rat or

8    mouse that has been trained to differentiate cocaine

9    from saline will accept nicotine as a substitute for

10   cocaine.  So that allows one to draw the conclusion

11   that nicotine and cocaine can be classified under

12   the same umbrella of effects -- in this case they're

13   both stimulants.  It should not be interpreted as

14   meaning that nicotine and cocaine are substantially

15   similar in their pharmacological effects.

16   Q       Same studies have shown that Ritalin and

17   cocaine --

18   A       Yes, it's also found that Ritalin or

19   methylphenidate fully substitutes for cocaine.

20   Ritalin and cocaine both have stimulant properties,

21   but again Ritalin and cocaine are not regarded as

22   substantially similar in their effects.

23   Q       Wellbutrin and cocaine?

24   A       Wellbutrin, bupropion -- bupropion is the

25   generic for Wellbutrin, that fully substitutes for

1    cocaine in these drug discrimination studies.

2    Bupropion has stimulant properties like cocaine, but

3    it would not be appropriate to regard Bupropion or

4    Wellbutrin as substantially similar to cocaine.

5    Q      And both amphetamine and cocaine and MDMA and

6    LSD have been determined.

7    A      There have been drug discrimination studies

8    that compare lots of different substances.  These

9    are used to help tease out what types of effects a

10   substance might produce and MDMA has been studies in

11   these drug discrimination studies, yes.

12   Q      From a scientific basis what can be concluded

13   from this sort of study?

14   A      The drug discrimination study gives us

15   important clues on the types of effects that a

16   particular substance might produce.  For example, we

17   can know that MDMA has -- or we can conclude that

18   MDMA has stimulant properties in rodents based on

19   these studies, but it doesn't give you the ability

20   to conclude, for example, that MDMA is substantially

21   similar to LSD in its effects just because it's

22   known that MDMA fully substitutes for LSD.

23   Q      Could these tests be refined further so they

24   would give a more meaningful statement?

25   A      There are ways to refine the tests further

1    that would allow one to draw conclusions that are

2    more refined compared to the broad categories, yes.

3    Q      How would that be done?

4    A      The drug discrimination studies discussed here

5    are called two choice drug discrimination studies

6    where the rodent is trained on THC or sale, or drug

7    or no drug.  There is also a three choice protocol

8    where the rodent is given a third option of a

9    different drug and then asked to choose whether it's

10   more like one drug or the other drug.

11          So, for example, MDMA fully substitutes for

12   LSD means that there must be some effects in common.

13   On the other hand, you can train a rodent to

14   differentiate MDMA and LSD and then that gives a

15   more refined level of what at least the rodent is

16   perceiving to be the subjective effects.  Again,

17   this would allow you to draw a hypothesis regarding

18   effects in humans, but you could draw conclusions

19   about the rodents.

20   Q      But simply a hypothesis as to humans.

21   A      As it to how it applies to humans, yes.

22   Q      The conclusions then that Dr. Fang came to in

23   his report, in vitro cellular functional study

24   results, he indicates that both are full agonists.

25   That's incorrect?

1    A       I'm sorry, repeat that?

2    Q       If I could approach.  Handing you Dr. Fang's

3    report.  On his conclusions, paragraph 2 of his

4    conclusions, is that an accurate statement?

5    A       Paragraph 2 of the basis for his opinion, data

6    from in vitro functional studies demonstrate that

7    both AB-FUBINACA and Delta9-THC act as full agonists

8    at the CB1 receptor, that is incorrect.

9    Q       His third point?

10   A       Third point, animal drug discrimination study

11   results -- there is some background information

12   provided on drug discrimination studies that as I'm

13   scanning through, it doesn't directly pertain to

14   AB-FUBINACA or THC.  At the end, data from in vivo

15   drug discrimination studies demonstrate that

16   AB-FUBINACA has subjective effects that are

17   substantially similar to the effects of THC.  That

18   statement -- that conclusion is not supported by the

19   data from the animal drug discrimination studies.

20   Certainly to not my satisfaction.

21   Q       And why is that?

22   A       Because full substitution in the drug

23   discrimination study doesn't allow -- doesn't

24   support the conclusion of substantially similar, for

25   the reasons that I've indicated.  For example,

1       nicotine is not in my opinion substantially similar

2       to cocaine.

3       Q       And then on four, clinical observations in

4       human toxicological reports?

5       A       Yes.

6       Q       Does this aid in the determination of whether

7       they're substantially similar drugs?

8       A       These clinical observations do not help us

9       make a subjective comparison to the effects of THC.

10      There are too many uncontrolled variables in the

11      clinical observations and there aren't clear ways to

12      make head to head comparisons to THC.

13      Q       Nor are you aware of the -- can you be made

14      aware of the protocol in terms of the collection of

15      this information.

16      A       Correct.  Well, I understand how many of these

17      pieces of information are collected.  They are

18      collected -- they're observations from an

19      uncontrolled environment that would be useful for

20      formulating a hypothesis regarding the dangers of a

21      drug.  If you see people presenting at emergency

22      rooms and then blood tests reveal that they have the

23      substance in their system -- whether it's caffeine

24      or XLR-11 or what have you -- you might formulate

25      the hypothesis that whatever substance was present

1    was dangerous.  Then you would go into the lab and

2    test those substances.  So you would make the

3    observation at the toxicology report level and then

4    use that to guide future experimentation.

5    Q      So that would have no real basis on the

6    opinion.

7    A      I'm sorry?

8    Q      That would have no real influence over the

9    ultimate opinion that was reflected by Dr. Fang.

10   A      I don't see how the toxicology reports of

11   these substances would help inform the opinion that

12   these substances are similar on not similar to THC

13   or marijuana.

14   Q      Let's get to you now.  Is it your opinion that

15   AB-FUBINACA and XLR-11 are not substantially similar

16   to THC and marijuana?

17   A      That is my opinion, that those substances are

18   not substantially similar to THC or marijuana.

19   Q      Did you do this through the three-prong test

20   in the guidelines oris there another basis on how

21   you made this determination?

22   A      To come to an opinion regarding substantially

23   similar, that "substantially similar" language is in

24   the analog enforcement act and referenced in the

25   guidelines as well, so using -- that's the opinion

1        that I have based on reading the guidelines.

2        Q        And there is three prongs to the guideline

3        test.   One is chemical structure?

4        A        Yes.

5        Q        I don't think there is any dispute that they

6        have similar chemical structures.

7        A        XLR-11 and AB-FUBINACA and THC and marijuana

8        are all different substances.   Those three that are

9        molecular substances have different structures and

10       there is no -- I certainly don't hold the opinion

11       that those structures are substantially similar and

12       I don't know anybody that does opine that THC has a

13       molecular structure that is similar to either XLR-11

14       or AB-FUBINACA.

15       Q        And then the next prong --

16              THE COURT:  Let me interrupt, Mr. Zaremba.

17       When you say molecular, is there a difference

18       between molecular structure and chemical structure?

19              THE WITNESS:  No, I'm sorry, I'm using those

20       synonymously.   I'll stick to chemical structure.

21              MR. ZAREMBA:  Your Honor, I could put on the

22       screen if the court issues though --

23              THE COURT:  Mr. Zaremba, relax for a moment.

24              Let me ask then with respect to the first

25       prong of that three-prong analysis that you just

1    referenced from the guidelines, what is your opinion

2    with respect to whether or not THC has a chemical

3    structure that is substantially similar to XLR-11

4    and AB-FUBINACA?

5            THE WITNESS:  My opinion is that it does not,

6    the THC does not have a structure that is

7    substantially similar to either XLR-11 or

8    AB-FUBINACA.

9            THE COURT:  All right.  Thank you.  Go ahead,

10   Mr. Zaremba.

11   BY MR. ZAREMBA:

12   Q     I briefly will go through the next one, the

13   effects on the central nervous system.

14   A     Same opinion, the effects on the central

15   nervous system -- my opinion is that based on the

16   data that is available and based on the reasonable

17   hypothesis as to what data would be available in

18   human users were that data available, that THC is

19   not likely to produce pharmacological effects that

20   are substantially similar to XLR-11 or AB-FUBINACA.

21   Q     And then at that point, Part C, potency, does

22   that even mean anything?

23   A     If the substances in question produce

24   different suites of effects, it becomes problematic

25   to compare potency because it will depend on what

1    particular experiment you set up, what aspect of the

2    test you are probing.

3    Q        So if they're not substantially similar, where

4    does that leave us?

5    A        The guidelines say right before we go into

6    those three prongs, those three qualifiers, to

7    identify the most closely related substance that is

8    listed in the guidelines for a substance that is not

9    listed in the guidelines.  There are instructions to

10   consider where possible if there is a substance that

11   is substantially similar in structure or if there is

12   a substance that is substantially similar in

13   effects.   In this case if we don't have substances

14   that are substantially similar, then we can't use

15   that additional guidance and so we're back to what

16   substance is most comparable to the substances in

17   question.

18   Q        So even though THC and marijuana are not

19   substantially similar, they're similar enough in

20   nature that we can use them as a basis for the

21   guidelines.

22   A        There are a number of substances listed in the

23   guidelines.  Some are more similar, some are less

24   similar.  The direction is to identify the one that

25   is most similar.

1    Q        So --

2    A        Most comparable, I should say.

3    Q        If I understand what you're saying correctly

4    -- correct me if I'm wrong -- from a scientific

5    perspective we're simply dealing with an analogy at

6    this point.

7    A        Yes.

8    Q        And it shouldn't be confused with the fact of

9    the matter.

10   A        It's a subjective comparison.  We've got

11   substances that are not listed in the guidelines.

12   These substances are more or less comparable to

13   different substances that are listed in the

14   guidelines.  They're all drugs of abuse.  Which of

15   these listed substances is the most comparable is

16   the question.

17   Q        So that leaves us with THC and marijuana.

18   A        Those are the two substances that I look to,

19   THC and marijuana.

20   Q        And why do you look to those?

21   A        Well, marijuana is the drug of abuse that

22   people are familiar with and THC is the active

23   ingredient in marijuana.  The analogies here would

24   be coffee is the drink of the morning -- at least

25   for me -- and caffeine is the active ingredient in

1       the coffee.  Advil is the pain medicine and

2       ibuprofen is the active ingredient.  I wouldn't

3       differentiate between the effects of ibuprofen and

4       Advil.

5       Q       The guidelines as you are aware treat THC and

6       marijuana differently?

7       A       The guidelines do treat THC and marijuana

8       differently.

9       Q       From a scientific point of view is there any

10      way to resolve this problem that they're treated

11      differently in an acceptable scientific manner that

12      works with the guidelines?

13      A       We have a pretty good idea -- we know exactly

14      how much THC in general is present in marijuana, so

15      we can -- and people track this and publish on THC

16      content in marijuana on a fairly regular basis.  And

17      so we know that the actual amount of THC in a

18      specific sample of marijuana will have some

19      variation, but to a first approximation marijuana,

20      the drug of abuse on the street today, is about

21      10 percent THC.  So scientifically you could make

22      the tie saying marijuana is about 10 percent THC by

23      weight, so 10 grams of marijuana -- if you were in

24      possession of 10 grams of marijuana, to a first

25      approximation you are in possession of approximately

1         1 gram of THC.

2         Q       And how would this relate to the synthetic

3    cannabinoids that we're dealing with today,

4    AB-FUBINACA and XLR-11?

5         A       Well, as I understand in this case we're

6    dealing with two different substances, the spice or

7    synthetic marijuana product and the powder

8    AB-FUBINACA product.  Those two different substances

9    are both, as far as I understand it, intended to

10   mimic the effects of marijuana ultimately on the

11   street.

12        Q       And how is as you call it spice, for want of

13   another term, a synthetic cannabinoid, how is that

14   delivered?

15        A       Let me correct that briefly if I could.  Spice

16   or synthetic marijuana or fake pot is the product on

17   the market.  A synthetic cannabinoid is -- a

18   cannabinoid is a substance that binds the

19   cannabinoid receptor.  A synthetic cannabinoid is a

20   substance that binds the cannabinoid receptor that

21   was produced in a chemistry lab.

22             So XLR-11, AB-FUBINACA, THC, and then the list

23   goes on and on, are all cannabinoids.  THC is a

24   synthetic cannabinoid if it was made in a lab.  It's

25   classified as an organic cannabinoid or just a

1       cannabinoid if it comes from the marijuana plant.

2       But the molecular properties -- the chemical

3       properties of THC are the same whether or not it's

4       synthetic or natural.

5              So the AB-FUBINACA, XLR-11, THC, those are

6       cannabinoids.  Marijuana, synthetic marijuana,

7       spice, that is the smokable product found on the

8       streets.

9       Q      All right.

10      A      I'm sorry, now I've forgotten your question.

11      Q      That's okay, I did too.  We'll get back to it.

12      We have two substances in this case.  One is powder

13      and one is inert plant material with --

14      A      With detectible levels of a cannabinoid on it.

15      Q      Are you aware of how this is ordinarily

16      produced?

17      A      Yes, I'm generally aware of how synthetic

18      cannabinoids are being harnessed and used to produce

19      synthetic marijuana.  I'm generally aware of that

20      protocol.

21      Q      So basically the powder -- tell me if I have

22      this right.  The powder is then used with some kind

23      of a base, acetone or something of that nature, and

24      is placed then on the inert plant material?

25      A      Yes, the powder, the synthetic cannabinoid is

1      mixed into the plant carrier material, generally

2      using a solvent that is later evaporated, in some

3      ratio of leafy carrier material to active

4      ingredient.

5      Q       And the ratio that could be used obviously

6      changes on a case-by-case circumstance.

7      A       Correct.

8      Q       But do you have a general idea what the

9      proposed ratio would be?

10     A       I don't know what the specific substance in

11     this case -- what that specific ratio would have

12     been, but the DEA has stated that a general

13     procedure for preparation is that one part of the

14     synthetic cannabinoid is mixed with 13 parts of

15     leafy carrier material to produce the synthetic

16     marijuana or spice substance.  If you have mixed the

17     cannabinoid one part with 13 parts of plant

18     material, the product, in this case, the spice,

19     so-called spice product, would be 1/14 active

20     cannabinoid ingredient.

21     Q       In other words, to make 14 grams of that, you

22     would have to put 1 gram of the powder on it.

23     A       Yes.  So if you are in possession of 14 grams

24     of spice product, then to a first approximation you

25     are possessing about 1 gram of the synthetic

1    cannabinoid.

2    Q       So in your opinion should the pure powder

3    AB-FUBINACA and the sprayed inert material be

4    treated the same for the guideline purposes?

5    A       No.  Those are different -- qualitatively

6    different substances.

7    Q       Again, why is that?

8    A       AB-FUBINACA is a -- depending on how pure it

9    is, but we'll presume it to be a pure substance, a

10   single substance that if analyzed by chemical

11   methods would reveal it to be at least to a high

12   degree of purity AB-FUBINACA.

13          The spice product is a mixture comprising many

14   different substances, depending what other

15   substances are present in the plant, but likely to

16   be only about 7 percent of the AB-FUBINACA or

17   XLR-11.

18          They are also fundamentally different in their

19   appearance.  And the way these substances are abused

20   as far as I understand it is that the synthetic

21   marijuana -- that they are smoked as alternatives to

22   marijuana.

23   Q       So do you have an opinion then of what the

24   ratio should be for the powder and for the inert

25   substance that's sprayed?

1    A      I do.

2    Q      What would that be?

3    A      For the pure powder that presumably is

4    intended to be converted into synthetic marijuana,

5    by the 14 -- by the 13 to 1 mixing ratio that the

6    DEA has identified, I would think that material

7    should be treated with a marijuana equivalency of 14

8    to 1.

9           The synthetic marijuana spice product that is

10   marketed and intended to mimic marijuana in

11   appearance and effects, I think should be treated

12   like marijuana.

13   Q      One to one?

14   A      One to one with marijuana, yes.

15   Q      I also asked you to take a look at the pure

16   THC, the natural THC.  That's a 167 to 1 ratio to

17   marijuana?

18   A      Yes.

19   Q      Could you see either any kind of scientific or

20   an empirical basis for that number?

21   A      No.

22   Q      Why is that?

23   A      I don't know where that number comes from.  It

24   doesn't correspond to the amount of THC and

25   marijuana as a drug of abuse.  I don't know where

1       that number comes from.

2       Q       What would you think would be more likely the

3       ratio?

4       A       The amount of THC that's typically found in

5       marijuana is -- it varies, but about 10 percent is a

6       reasonable general approximation.  In the

7       guidelines -- so if you're holding 10 grams of

8       marijuana, you've got about a gram of THC.  I think

9       the more appropriate ratio for THC is 10 to 1.

10              For example, in the guidelines, the guidelines

11      have identified -- say if you're holding 200 grams

12      of marijuana, you can treat that as if it was 1 gram

13      of cocaine.  And that's just stated from the

14      guidelines and that's a given.

15              But the marijuana to THC ratio is more

16      complicated because if you're holding 167 grams of

17      marijuana, that's not like holding a gram of THC,

18      that's like holding 15 or 16 or 17 grams of THC.

19              MR. ZAREMBA:  I have nothing further, Your

20      Honor.

21              THE COURT:  Cross-examination, Mr. Murray?

22                      CROSS EXAMINATION

23      BY MR. MURRAY:

24      Q       Good morning, sir.

25      A       Good morning.

1    Q       Your background is primarily in chemistry; is

2    that correct?

3    A       Chemistry, yes.  Chemistry is a broad field.

4    Q       Do you have any background in pharmacology?

5    A       I did my post-doctoral training in the

6    molecular pharmacology and chemistry program at the

7    Memorial Sloan Kettering Cancer Center.

8    Q       You would agree with me that Dr. Fang can rely

9    on several factors, multiple factors to reach his

10   opinion, not just one or two factors, correct?

11   A       From looking at his opinion he relied on the

12   in vitro cellular receptor binding studies that show

13   that XLR-11 and AB-FUBINACA are cannabinoids, he

14   relied on the functional study results that show

15   that they are cannabinoids, and he relied on the

16   drug discrimination study results.

17           He also includes the clinical observations,

18   but I don't see how those support the opinion

19   regarding whether or not it's substantially similar

20   to THC.

21   Q       You don't believe that he can rely on those

22   factors reports related to human subjects which

23   starts on page 20?  You don't think it's relevant to

24   his opinion?

25   A       In terms of comparing to THC and opining that

1    one of the substances is substantially similar to

2    THC, I would not use these observations to opine

3    that it is substantially similar to THC.  But I've

4    also offered what I consider to be a substantially

5    similar -- I don't know what he considers.

6    Q       From a pharmacological perspective you don't

7    think it's relevant to hear reports of what happened

8    to human beings who ingested those substances, you

9    don't think that's relevant?

10   A       It's relevant to hear that information and you

11   would use that information to formulate a

12   hypothesis, but in order to draw conclusions you

13   would have to test those hypotheses.  And in order

14   to form opinions regarding whether or not two things

15   are similar you would want to be comparing data.

16   You don't want to be comparing a hypothesis for one

17   versus a hypothesis for the other.

18   Q       On page 20 this study referenced the Shanks,

19   Winston, Heidingsfelder and Behonick study which

20   begins with the discussion of how the deaths of two

21   individuals were associated with XLR-11 and Dr. Fang

22   testified that that was a relevant factor for him,

23   that's part of his analysis, a multifactor analysis.

24   A       I think if you see data that indicates that

25   there are people have died and those people have a

```
 1      particular substance in their system, that is an

 2      indication that you should look at that substance.

 3      Is this substance dangerous?  Perhaps it is

 4      dangerous.

 5      Q       You would agree that XLR-11 is dangerous?

 6      A       I would certainly not want to argue to the

 7      contrary, yeah, I agree XLR-11 -- and any substance

 8      indeed can be dangerous if not used correctly.  And

 9      there is no FDA approved -- XLR-11 is not a

10      medicine.

11      Q       Same for AB-FUBINACA, correct?

12      A       Same for AB-FUBINACA.  Observations that

13      reflect the danger of a particular substance doesn't

14      help me form an opinion as to whether or not it's

15      substantially similar to another substance.

16      Q       You testified about -- you had your caffeine

17      versus coffee analogy.

18      A       Yes.

19      Q       That's relevant because coffee is a natural

20      substance, a natural compound, correct?  Or contains

21      compounds.

22      A       Coffee is a heterogenous mixture, it's a brew

23      that includes a number of different substances in

24      it.  The operative substance is caffeine; the active

25      ingredient in coffee is caffeine.
```

1    Q        You would agree with me that as a natural

2    substance, coffee, there are ingredients in coffee

3    that ameliorate the effects of caffeine.

4    A        I don't know that.

5    Q        With marijuana there are over 300 substances

6    in marijuana, correct?

7    A        I have heard that number cited.  There are

8    undoubtedly many different substances in marijuana

9    and it could be more than 300 different substances.

10   If that's going to be a level of detection, the

11   better we are at detecting and characterizing the

12   different substances -- there are many.

13   Q        A lot of different substances naturally grown,

14   correct?

15   A        The marijuana plant is a natural botanical

16   plant and the processing from the marijuana plant to

17   the actual marijuana is going to carry a lot of

18   those different ingredients forward and so the

19   ultimate marijuana product will have many different

20   substances in it.  These substances have been

21   analyzed and people have looked at what substances

22   are most relevant to the pharmacological effects and

23   how much of those substances are generally likely to

24   be present.

25   Q        You would agree with me that's far different

1    than how these products are used, AB-FUBINACA and

2    XLR-11, correct, that the outcome is very different.

3    A       Well, the ultimate product that we're -- that

4    the drug of abuse is the spice product, synthetic

5    marijuana, that is a heterogenous mixture of a plant

6    substance with lots of different ingredients, many

7    of which are probably unknown, but most relevant to

8    the present discussion is the active ingredient

9    which in the case of marijuana would be the THC and

10   in the case of the spice or synthetic marijuana

11   would be whatever cannabinoid was put in there.   In

12   both cases you're dealing with a plant-based drug

13   substance that is smokeable that contains some level

14   of an active cannabinoid ingredient.

15   Q       So let me just ask the question.   So you're

16   trying to say that Mr. Zeidan spraying a pure

17   chemical onto a leafy substance produces the same

18   ratio and same pharmacological effects as a

19   naturally grown substance that's going to have

20   compounds throughout it that are interacting with

21   each other and ameliorating each other at some

22   degree, you're saying that's the same, someone

23   spraying a pure chemical onto something for a human

24   ingestion versus what nature does to a compound and

25   the numerous compounds interacting, you're saying

1      that's the same result?

2      A      Well, I didn't say that they were the same and

3      indeed I said that they were not substantially

4      similar.  But the final result, the synthetic

5      marijuana, is more similar to marijuana than it is

6      to mushrooms or cocaine.  Those are the substances

7      listed in the guidelines and marijuana is the most

8      comparable.

9      Q      You're saying a synthetic substance, a manmade

10     substance being sprayed -- a pure substance being

11     sprayed onto material is not like a pure THC, not

12     pure THC, but it's more like a natural mixture,

13     you're saying it's more like marijuana and not THC,

14     is that your opinion?

15     A      The final product, the synthetic marijuana,

16     the leafy plant material, is more like marijuana,

17     the leafy plant material that contains a

18     cannabinoid, than it is to the pure THC which is

19     neither a leafy plant material nor a powder but

20     rather a viscous oil.

21     Q      But you would agree when Mr. Zeidan and others

22     are spraying this material onto a substance, you get

23     hot spots -- don't you get hot spots when it's just

24     sprayed not in a laboratory but in a storage unit,

25     when he's just spraying chemicals onto other

1     materials that are manmade, you get hot spots --

2     don't you get hot spots?

3     A       The substances in question in this case I

4     don't know who prepared them, I don't know the

5     manner in which they were prepared.  What seems to

6     be clear from the literature is that in any case the

7     marijuana or synthetic marijuana is going to vary in

8     terms of the levels of the active ingredient.  These

9     are heterogenous mixtures.

10          So I think to jump ahead to your question,

11    different batches of spice or synthetic marijuana

12    first of all are going to have different

13    cannabinoids in them and probably different levels

14    of cannabinoids in them.  Likewise, different

15    batches of marijuana are likely to have different

16    levels of THC in them.  When we're talking though in

17    broader terms, what is the likely amount of THC in a

18    given sample of marijuana today, it's probably on

19    the order of about 10 percent and based on the

20    DEA -- information that the DEA has provided, a

21    sample of spice or synthetic marijuana is likely to

22    be about 1/14th of the active cannabinoid.

23    Q       You would agree with me cannabinoids are not

24    prepared in the lab, right, they're prepared by

25    untrained people spraying pure chemicals onto other

1      materials, correct?

2      A      Well, the cannabinoid substance, the XLR-11 or

3      AB-FUBINACA, would be prepared in a chemistry lab.

4      The manufacturing process, if you will, for

5      producing the synthetic marijuana product would be

6      produced probably not in the type of chemistry lab

7      that I'm familiar with, so it would just depend on

8      what -- how broad of a definition of laboratory is.

9      Q      Well, in a storage unit, if someone is just

10     spraying this material onto other materials for

11     human consumption, you're going to get hot spots,

12     you're going to get very high concentrations of that

13     material for human ingestion and that's very

14     dangerous, you would agree with me?

15     A      I think you're asking me about the quality

16     control in the manufacturing process.

17     Q      There is none, right, there is no quality

18     control?

19     A      I can't speak to the quality control in the

20     manufacturing process.

21     Q      I don't think you've answered my question.

22     A      I cannot testify that there is no quality

23     control.  I don't know.

24     Q      If this substance -- if XLR-11 is sprayed onto

25     material by an untrained -- not a chemist, a lay

1    person, and they just spray it on there you're going

2    to get high concentrations of that in certain areas,

3    correct, hot spots?

4    A    I think what you're suggesting here is that we

5    consider the hypothetical --

6    Q    No, we'll consider the fact of this case,

7    we'll consider how this was being done, how this

8    product in this case that was going to be sold in

9    Tampa and in Chicago, the drugs that this defendant

10   was helping to manufacture --

11        THE COURT:  Mr. Murray, I don't know what this

12   has to do with the issue I've got to decide.

13        MR. MURRAY:  Nothing further, Your Honor.

14        THE COURT:  I don't mean to cut you off,

15   but --

16        MR. MURRAY:  Nothing further, Your Honor.

17        THE COURT:  Mr. Zaremba, anything else?

18        MR. ZAREMBA:  I don't believe so, Your Honor.

19   Thank you.

20        THE COURT:  All right.  I'm going to ask this

21   question of Dr. Dudley, and I'll probably ask it of

22   Dr. Fang.  I have the responsibility of trying to

23   figure out how these guidelines apply from a legal

24   perspective.  To some extent it appears I have to

25   consider the chemistry.  They don't teach chemistry

1      in law school, Dr. Dudley, so keep it at a level

2      that everybody in this courtroom can understand for

3      purposes of my question.

4           I think I understood you to say that when all

5      is said and done, in your opinion the most closely

6      related controlled substance referenced in this

7      guideline to XLR-11, AB-FUBINACA, is marijuana, THC.

8      You said THC and marijuana, correct?

9           THE WITNESS:  Correct.  From a scientific

10     perspective, it's how do you differentiate between

11     those two when you talk about the effects because

12     the pharmacological effects of marijuana are linked

13     to THC.  The same way you wouldn't differentiate

14     between ibuprofen and Advil or coffee and caffeine,

15     THC is the active ingredient in marijuana.

16          THE COURT:  But you use the word analogy.  I

17     assume and understood that to mean you're asking me

18     a question or asking me to express an opinion that

19     cannot be stated in chemical terms but by analogy

20     can be stated.  Is that roughly correct?

21          THE WITNESS:  I'm sorry, I didn't quite

22     follow.

23          THE COURT:  I apologize.  The guidelines

24     require us to look at a three-part test in

25     determining the most closely related controlled

1          substance referenced in the guidelines.

2               THE WITNESS:  To the extent practical.

3               THE COURT:  I think you're saying it's not

4     practical, but by analogy I'll give you an answer;

5     is that right?

6               THE WITNESS:  The guidelines say to use the

7     most closely related substance.  And when you're

8     trying to determine the most closely related

9     substance, to the extent that you can, consider

10    whether the substance is substantially similar in

11    chemical structure, which I don't think applies

12    here; whether the substance is substantially similar

13    in its pharmacological effects, which I don't think

14    applies here; and the potency, which I also don't

15    think it applies here.

16              Now, there are substances in the guidelines

17    that produce similar effects, namely THC and

18    marijuana.  That substantially similar bar is quite

19    high if it means that, as it does in the Analog

20    Enforcement Act, that if two substances are

21    substantially similar they can be treated as the

22    came.  So we know that nicotine -- well, we don't

23    know, but my opinion is that nicotine and cocaine

24    are not substantially similar in their

25    pharmacological effects, and I would offer the same

1      opinion that XLR-11 and THC are not substantially

2      similar in their pharmacological effects.  So those

3      three prongs aren't helpful here.  So we're back to

4      the original guidance from the guidelines of

5      determine or find the most closely related

6      controlled substance, and in my opinion that would

7      be marijuana or THC.

8              THE COURT:  And that is the same opinion that

9      Dr. Fang reached, is it not?

10             THE WITNESS:  I think his opinion -- well, I

11     can't really speak to his opinion, but my

12     understanding is that his opinion is it's THC and

13     not marijuana.

14             THE COURT:  THC.

15             THE WITNESS:  Yeah.

16             THE COURT:  So the actual distinction between

17     his ultimate conclusion and yours has to do with the

18     ratios that are applied?

19             THE WITNESS:  The problem that -- so I

20     identify THC and marijuana.  But then the problem is

21     that the guidelines don't treat THC and marijuana

22     proportionately.

23             There are other examples in the guidelines

24     like hallucinogenic mushrooms and psilocybin, which

25     would be the active ingredient.  Those substances

1    like psilocybin and hallucinogenic mushrooms are

2    listed differently and treated differently in the

3    guidelines, but the difference between them varies

4    in a logical way relative to the amount of

5    psilocybin in mushrooms.  So psilocybin and

6    mushrooms, the differences in the guidelines are

7    consistent with the different doses, with the amount

8    of psilocybin mushrooms.  The same is true for

9    peyote and mescaline, but it's not true for THC and

10   marijuana.  And that is -- I don't know that it's

11   unresolveable, but it's a dilemma.  And as you know

12   from my report, the guidelines -- I noticed in the

13   guidelines that sometime -- the commission said

14   sometimes further refinements are necessary and that

15   the object of the -- the attempt is treated as if

16   the object of the attempt were successful.  And so

17   that helps me narrow my focus down to marijuana

18   because ultimately I think what the facts of this

19   case are about is it's about spice, it's a synthetic

20   marijuana product that is intended to look and act

21   like marijuana.

22       You know from my testimony that my opinion is

23   that it doesn't produce the same effect as

24   marijuana, it doesn't -- it probably doesn't produce

25   a substantially similar effect as marijuana.  But

1       the effect is, in my opinion, most comparable to

2       marijuana compared to LSD or cocaine.

3               THE COURT:  All right.  Thank you.  I

4       appreciate that answer.  Anything else, Mr. Murray

5       or Mr. Zaremba?

6               MR. MURRAY:  No, Your Honor.

7               MR. ZAREMBA:  No, Your Honor.

8               THE COURT:  Thank you, sir, you may step down,

9       please watch your step.

10              Any additional witnesses, Mr. Zaremba?

11              MR. ZAREMBA:  No, Your Honor.

12              THE COURT:  We're going to take a short

13      comfort break.  Let's get back in 5 minutes, please.

14              (Recess was taken from 11:24 until 11:35 a.m.)

15              THE COURT:  Well, I feel like I'm back in

16      college, signed up for a class that I have no

17      interest in or an ability to understand, but forced

18      to take.

19              I preface my remarks so that the two of you in

20      your argument can try to make some sense out of the

21      competing testimony that we just heard from two

22      imminently qualified witnesses.

23              I think the only common ground that they have

24      is that they, in an attempt to follow the

25      guidelines, conclude that THC is a closely related

```
1        controlled substance to the two substances at issue.

2        And then of course they differ with respect to

3        Dr. Dudley's default to marijuana.

4             Mr. Murray, make sense out of it, if you can.

5             MR. MURRAY:  Your Honor, I appreciate

6        everything the court said and I think it appears to

7        be difficult, but I think at a very simple level

8        people consume marijuana because of the THC.  That's

9        what the goal is, to get the effects on the body

10       that THC has on the mind and the body.  And so the

11       marijuana plant is a medium for THC.

12            What Dr. Fang is saying is that the

13       pharmacological effects on the body based on all the

14       factors not just the rat study but also on reports

15       from emergency rooms, reports from medical

16       professionals that have found people with adverse

17       effects, toxic effects on the body, that they have

18       found XLR-11 and AB-FUBINACA in those patients, that

19       given those factors and all the factors he's

20       identified, that his expert conclusion is that the

21       pharmacological effects of THC, AB-FUBINACA, and

22       XLR-11 are substantially similar.

23            And I think that makes common sense, Judge,

24       that's how I look at it because something that's

25       grown in nature, marijuana has I think 300
```

1    substances or so, the experts have testified to.  It

2    has a natural effect, there is different compounds,

3    it's not pure drug, it's not pure substance.  That's

4    so different than the facts of this case, an

5    untrained person, a street level drug dealer taking

6    a synthetic substance and spraying it on a medium,

7    applying it to a medium for human consumption.

8    That's essentially giving the customer access to the

9    substance for easy ingestion in the body.  The

10   substance is just applied to the XLR-11 or

11   AB-FUBINACA is readily available to impact the body,

12   to impact the mind.  As opposed to marijuana where

13   the THC is coming up with other compounds.  The

14   coffee versus caffeine analogy is helpful; it's not

15   pure caffeine, coffee has other substances in it,

16   some of them accelerate or impact the caffeine in a

17   consistent way, some of them ameliorate the effects.

18   And that's why I think, Your Honor, the Sentencing

19   Commission has said that these synthetic

20   cannabinoids, XLR-11 and AB-FUBINACA, they're much

21   more like the pure THC, that they're much more like

22   the substance that causes marijuana to get people

23   high --

24        THE COURT:  Well, the guidelines don't say

25   that; that's your theory of what the guidelines

1     should say.

2           MR. MURRAY:  I stand corrected, Your Honor,

3     yes, that's why that's our opinion.  Because you

4     have to draw -- it's a line drawing exercise and it

5     is difficult, it does put the court in a difficult

6     position.  But I think comparing a natural plant

7     versus a synthetic substance, a man-made substance

8     that is going to be sold on the street, that's going

9     to have this chemical just sprayed or applied

10    randomly by a drug dealer -- not a chemist, not a

11    pharmacologist, not a doctor, that just makes sense

12    that the guidelines are going to treat that

13    substance as THC, the psychoactive substance in

14    marijuana, as opposed to the natural compound of

15    marijuana.

16          I think that's the issue and I think framed

17    that way it is not -- it's actually not that

18    difficult.  I think that's why the Tampa Division

19    has consistently applied the 1 to 167 ratio, I think

20    it makes common sense.  And I think Dr. Fang's

21    opinion --

22          THE COURT:  When you say the Tampa Division,

23    who are you talking about?

24          MR. MURRAY:  May I have a moment, Your Honor?

25    I provided Mr. Edwards with some cases and I thought

1      they made it to the presentence report, but they

2      didn't.

3            THE COURT:  Are these opinions of my

4      colleagues?

5            MR. MURRAY:  I just spoke with Mr. Preston.

6      He's mentioned that Judge Honeywell I think has

7      twice applied the --

8            THE COURT:  What my colleagues have done in a

9      given case is of no interest to me.  I don't know

10     what witnesses they considered, what expert

11     testimony they heard, I have no idea what the basis

12     for their conclusions are.  I respect them greatly,

13     but that's not helpful to me.

14           MR. MURRAY:  Yes, Your Honor.

15           THE COURT:  What's helpful to me is your

16     explanation as well as Mr. Zaremba's of the

17     testimony of these two experts and what the

18     distinctions are.

19           MR. MURRAY:  I don't have much else to add,

20     Your Honor.  I think Dr. Fang's opinion though is

21     valid given he considered many factors.  I think

22     Mr. Zaremba focused on the rat study; that wasn't

23     just the only factor.  I do think it's relevant

24     they've considered data from emergency rooms and the

25     impact on human beings --

1          THE COURT:  Well, Dr. Dudley says that's all

2     hypothesis, not data, and it requires data

3     comparison as opposed to comparison of hypotheses.

4     He's not critical of -- as I understood his

5     testimony, he's not critical of the fact that

6     experts should consider these matters, in fact he

7     acknowledged you should consider them, but in terms

8     of drawing conclusions the data is not sufficient.

9     What is your response to that?

10          MR. MURRAY:  Our response, Your Honor, is that

11     it is sufficient, that Dr. Fang has relied on many

12     factors, not just the impact of human studies, that

13     is a relevant factor and that the experts just

14     disagree in that regard --

15          THE COURT:  There are no human studies.  You

16     meant the rat studies?

17          MR. MURRAY:  I meant the reported -- the human

18     effects --

19          THE COURT:  The effects.  Those aren't

20     studies, those are just reports by physicians from

21     hospitals and -- as I understood the testimony.

22          MR. MURRAY:  Yes, Your Honor, that's correct.

23     So I think there our experts disagree.  But I think

24     Dr. Fang reaches the more reasonable conclusion.  I

25     think it just makes more common sense that XLR-11

1    and AB-FUBINACA should be treated as a pure

2    substance, THC, as opposed to a naturally grown

3    plant which is going to have all these other

4    compounds, some of which are going to reduce the

5    effects of THC which are going to balance the

6    distribution of the THC, as opposed to a defendant

7    just spraying this chemical, pure chemical onto a

8    medium for human consumption.  I think that's why we

9    have our position, Judge, just makes more sense to

10   us that Mr. Zaremba's expert's opinion just doesn't

11   make sense, doesn't make common sense when you

12   compare is it more like marijuana or is it more like

13   THC.

14       I think given all these facts and

15   circumstances they're much more analogous to a pure

16   chemical, pure THC as opposed to a plant.  We

17   acknowledge it's a difficult issue, Your Honor, but

18   I think it's common sense weighs towards our opinion

19   as opposed to the defense position, Your Honor.

20       THE COURT:  Well, I would hope common sense

21   has something to do with what I do in this

22   courtroom, but I will tell you that it doesn't sound

23   like I am dealing with common sense at all.  And

24   that's what's frustrating about these guidelines.

25   We're delving into an area that we are ill equipped

1    to deal with as judges and lawyers and must

2    necessarily rely on experts.  And I am troubled by

3    the fact that I'm having to figure something out

4    from a pharmacological and chemical perspective when

5    the most important thing in this many courtroom is

6    what sentence I'm going to impose on this defendant

7    for violating the law.

8        So that said, let's hear from Mr. Zaremba.

9    Thank you, Mr. Murray.

10       MR. ZAREMBA:  Your Honor has heard a lot of

11   testimony involving science, and the court made a

12   statement about common sense and I understand the

13   court's frustration in that regard.  However, this

14   is a scientific determination that's being made here

15   and when you look at the factors involved that the

16   guidelines dictate that we're to look at as to

17   finding what the closest subject chemical would be

18   or controlled substance would be, it gives us a

19   three-prong test to look at.

20       I'm not going to go through them all again, I

21   know the court is familiar with them.  But the

22   essence really of Dr. Dudley's testimony is there is

23   nothing that's substantially similar to AB-FUBINACA

24   or as to the XRL-22.  But then we have to go to the

25   next step, seeing how we cannot find a substantially

1    similar drug and see what they think might be that

2    substantially similar drug.

3        We have the object of the attempt in this

4    circumstance which is to produce a synthetic

5    cannabinoid marijuana product, synthetic marijuana.

6    It's sprayed, we know from testimony of both the

7    experts what's done with it.  It's sprayed on some

8    type of plant material, inert or not inert.  We

9    don't have testimony about in the this circumstances

10    because we don't know what it was sprayed on --

11    actually, I do believe we know it was inert.  And

12    that's the object of the event.

13        And we know that basically marijuana has about

14    10 percent THC on average, but that can vary.  We

15    know that from the production of the finished

16    product, it's basically a 1 to 14 ratio between the

17    two.  The object is to produce something that's a

18    synthetic marijuana.  We don't have a giant guide

19    anywhere on what is the proper chemical.  All we

20    know is this is maybe the closest thing we have as

21    we go -- as we winnow down the process.

22        Dr. Dudley's testimony is very simple and

23    direct on that issue, it should be 14 to 1 for the

24    powder and because that powder then is then turned

25    into a product, that product on average -- perhaps a

1    strong average, it was DEA's information -- would

2    then be 1 to 1.  And that seems to me a fairly

3    decent rough calculus to help decide this factor.

4         Certainly the powder, which can be used to

5    produce a significantly more larger, 14 times amount

6    of the inert substance that becomes the spice-like

7    material, would have a higher value.

8         What that value would be hasn't been really

9    seriously scientifically tested, we don't have

10   enough information on it based on the studies that

11   have been done so far.  That's what I got from all

12   of these -- both testimony.  But we know what the

13   closest thing would be -- most likely be marijuana.

14   And from that we can make a determination of where

15   we're headed with that.

16       I think then ask at the end because the red

17   herring -- not the red herring but the elephant in

18   the room is the 167 to 1 ratio for pure THC.   I

19   asked Dr. Dudley about that.  Even though it doesn't

20   necessarily relate to the issue before the court

21   once we get away from the fact that it's not

22   substantially similar, it's still a reference point.

23   And I asked Dr. Dudley at that point, well, is there

24   an empirical basis behind this or a scientific basis

25   behind this that you can see.  His answer was no.

1    From the research I've done, I'm not going to tell

2    the court I'm able to understand it, but I could

3    find nothing that substantiates the 167 to 1 ratio.

4         What caught my attention on that was Judge

5    Middlebrooks down in Miami saying -- he called the

6    Sentencing Commission, they could give him no

7    information on how that was derived.  I then

8    followed that line a little bit down the road,

9    looking at different articles on it, and I could

10   find no basis for it either.  But I wanted to get

11   some scientific testimony as to that, even though at

12   this point I believe that's an ancillary issue

13   because the real issue is which is similar to, not

14   just substantially similar to.

15        So I would think an easy -- there is no easy

16   resolution here, Your Honor, I understand that.  And

17   it's difficult, I scratch my head quite a bit trying

18   to sort my way through it.  But it makes perfect

19   sense to me that a 14 to 1 ratio on the powder would

20   be appropriate, and 1 to 1 on the actual spice

21   cigarettes which would be the finished product.

22        We don't have any information to take us

23   anywhere beyond that and I would argue to this court

24   that would be the appropriate starting point for the

25   guideline purposes.

1          THE COURT:  As a trier of fact I have before

2     me two experts who I consider both to be imminently

3     qualified based on their education, background and

4     experience.  That does not mean, however, that the

5     opinions expressed are accepted.

6          I have considered the basis of their opinions,

7     the methodology employed, the reliability of that

8     methodology and the opinions expressed.  And

9     although they both agree that attempting to apply

10    the three-prong test under 2D1.1, application note

11    6, at least I understood their testimony to be that

12    that's not an appropriate way to determine the most

13    closely related controlled substance referenced in

14    the guidelines.

15         Dr. Dudley in my view painstakingly attempted

16    to do that, whereas Dr. Fang jumped to the effects

17    of the substances without even addressing the

18    chemical structure.  In that respect Dr. Dudley's

19    analysis and methodology is more reliable and more

20    convincing.  And while they both agree that THC is

21    the most closely related controlled substance

22    referenced in the guidelines, they differ with

23    respect to whether THC or marijuana should be

24    considered the most closely related controlled

25    substance.

1          Although I find Dr. Fang to be imminently

2     qualified, I do find that to the extent he relied on

3     the in vitro studies and the reported effects on the

4     various patients to reach a conclusion, that

5     conclusion is not for purposes of Daubert reliable.

6          I find more persuasive the testimony of

7     Dr. Dudley that one should not reach conclusions

8     based on these types of studies and reports because

9     they essentially are nothing more than hypotheses

10    and one should not be relying on an hypothesis in

11    reaching a conclusion.

12         Whereas Dr. Fang reached a conclusion,

13    Dr. Dudley considered the information but in

14    addition considered the differences in chemical

15    structures, the differences in cellular responses,

16    and the different mechanisms of action,

17    distinguishing between a partial agonist and a full

18    agonist, which Dr. Fang did not.

19         I find that testimony from Dr. Dudley more

20    persuasive in differentiating the effects.  His

21    analysis most closely aligned with the three-prong

22    test in application note 6 of 2D1.1 of the

23    guidelines, although as he acknowledged in his

24    opinion there are no substantially similar

25    substances in the guidelines to XLR-11 and

1    AB-FUBINACA and the pharmacological distinction

2    between the mechanisms of action lead him to

3    conclude, among other things, that there is no

4    substance listed in the guidelines that is

5    substantially similar to either XLR-11 or

6    AB-FUBINACA with respect to their effects on the

7    central nervous system.  Parenthetically, he noted

8    that it's difficult to analyze the potency because

9    of the different mechanisms of action,

10   distinguishing again between the partial agonist and

11   full agonist.

12        He does conclude by analogy, however, and I

13   think reluctantly, because he's now entering the

14   legal world as opposed to the chemical and

15   pharmacological world, that the most closely related

16   controlled substances to the synthetic cannabinoids

17   in this case that are referenced in the guidelines

18   are THC and marijuana.

19        I therefore accept the opinions and testimony

20   of Dr. Dudley as more reliable and more persuasive.

21        That being said, I need to delve into the

22   equivalency and we'll do that after we break for

23   lunch.  I want to study my notes and review the

24   testimony of Dr. Dudley so that I am satisfied I

25   have an accurate understanding.

1            So let me ask you, Mr. Zaremba and Mr. Murray,

2      what are your plans this afternoon?  Can you be

3      available after lunch?

4            MR. MURRAY:  I am, Your Honor.

5            MR. ZAREMBA:  Your Honor, I have a probation

6      interview that I can set off farther in the day, I'm

7      sure.

8            THE COURT:  Let's come back then at 1:15 by

9      the courtroom clock and we'll pick up where we left

10     off.  Thank you.

11           (Lunch break.)

12           THE COURT:  All right, we are reconvened.  I'm

13     going to try to summarize my findings.  I may have

14     already done some of this, but I want the record to

15     be very clear that I've made certain credibility

16     findings in this proceeding based on a number of

17     variables, some of which may not be reflected in the

18     record.

19           As I said, both experts are imminently

20     qualified on paper.  There is one distinction

21     between their credentials.  Dr. Dudley has an

22     educational background in chemistry and

23     pharmacology.  As he explained it to Mr. Murray, he

24     did his postdoctorate training in molecular

25     pharmacology and to that extent his expertise

1        extends beyond that of Dr. Fang's.

2            By the way, the court reporter brought to my

3        attention I may have used the surname Yang instead

4        of Fang.  I apologize to Dr. Fang, it is Fang,

5        F-A-N-G, and I've asked her to correct that.

6            As Dr. Fang acknowledged to me, he did not

7        express any opinion on the comparative chemical

8        structures of these substances because as he said,

9        he is not a chemist.

10           Secondly, I had some difficulty fully

11       understanding the testimony of Dr. Fang, which I may

12       attribute to some language difficulties.  He is a

13       native Chinese and because I did not have the

14       benefit of his report, I did rely on his spoken

15       testimony as well as the slide presentation which,

16       although admitted as Exhibit 1, is really nothing

17       more than a bullet point summary of his analysis.

18       And like any trier of fact, particularly juries, I

19       find myself -- I found myself in the position of

20       trying to understand completely the testimony of the

21       two experts in attempting to fully appreciate the

22       differences between their opinions.  And as I said

23       earlier, I found Dr. Dudley's methodology more

24       reliable, therefore his conclusions more reliable.

25       And it may be because of his broader background in

1    chemistry and his laudable understanding of the

2    nuances in the guidelines and the application notes.

3         As I indicated earlier, Dr. Dudley found fault

4    with some of Dr. Fang's methodology, particularly

5    the fact that Dr. Fang based his conclusions and

6    opinions on the in vitro rodent studies and the

7    medical reports from various hospitals, specifically

8    with respect to the effect on the central nervous

9    system of these two substances, XLR-11 and

10   AB-FUBINACA.  While, as Dr. Dudley acknowledged,

11   understanding that information was appropriate, it

12   would not be appropriate and in my view reliable to

13   base conclusions on that information because it did

14   not constitute data from a scientific standpoint and

15   was more akin to hypothesis and he therefore,

16   Dr. Dudley, would not base his opinions on those

17   studies, if you will.

18        More specifically, with respect to the

19   pharmacological effects of XLR-11 and AB-FUBINACA,

20   Dr. Fang concluded that those effects were

21   substantially similar to those of THC, again relying

22   expressly on the "drug discrimination data," i.e.

23   the rodent studies.

24        Dr. Dudley -- persuasively in my view --

25   points out that there is insufficient

1    pharmacological data to support an informed

2    scientific opinion on the subjective effects of

3    XLR-11 and AB-FUBINACA.   There obviously have not

4    been any clinical studies with respect to human

5    beings because of safety concerns, as Dr. Fang

6    pointed out.   Through no fault of his, of course, as

7    Dr. Dudley opined, there is not enough reliable

8    scientific data to delve into the comparative

9    pharmacological effected of XLR-11 and AB-FUBINACA.

10   He pointed out persuasively that there are

11   significant pharmacological differences between

12   partial agonists such as THC and full agonists such

13   as XLR-11 and AB-FUBINACA and there are significant

14   distinctions between the mechanism of actions with

15   respect to those substances, that is the effect on

16   the CB1 receptor, which he concludes understandably

17   complicates any comparison or discussion of

18   differences in potency.

19        All that being said, I reject Dr. Fang's

20   testimony.   It is essentially what has been referred

21   to in the case law as ipse dixit, that is the expert

22   is asking us to take his word for it.   And I'm not

23   being critical of Dr. Fang, I am simply pointing

24   out, as Dr. Dudley did, that there is just not

25   sufficient reliable data on which to premise these

1          conclusions.  Dr. Fang's opinions about the effects

2          are just not sufficiently reliable because the

3          methodology is lacking.

4              I accept as persuasive Dr. Dudley's opinion

5          that the most closely related controlled substance

6          to the synthetic cannabinoids in this case are THC

7          and marijuana.  And as I said earlier, he differs

8          from Dr. Fang because he includes marijuana in the

9          conjunctive.  Dr. Fang stopped at THC.

10             But as Dr. Dudley points out, the guidelines

11         treat THC and marijuana differently and as I

12         understood his testimony there are reasoned

13         distinctions between the two such that marijuana

14         should be, and is, as I conclude and find, the

15         reference substance in the guidelines that should be

16         selected as the most closely related to the

17         synthetic cannabinoids.  As he phrases it, what are

18         the appropriate marijuana equivalencies for

19         synthetic cannabinoids and smokeable synthetic

20         cannabinoids products?  He notes, parenthetically,

21         that there is no scientific basis for the ratio of

22         167 to 1 that exists in the guidelines with respect

23         to THC.  And I accept that conclusion because no one

24         has suggested to me in this hearing any scientific

25         basis.  So that ratio is not supported in the

1      literature, according to Dr. Dudley, as I said

2      parenthetically because he went directly to the

3      marijuana equivalency and concluded that with

4      respect to the powder, AB-FUBINACA, which I

5      understand to be 4.97 kilograms, the appropriate

6      marijuana equivalency is 14 to 1.  With respect to

7      the smokeable synthetic cannabinoid, spice, the

8      XLR-11, the appropriate marijuana equivalency is 1

9      to 1 for the 202.18 kilograms.

10          He goes through an analysis, which I find to

11     be not only persuasive but helpful in ascertaining

12     that the object of attempting to produce synthetic

13     smokeable marijuana is to produce in fact synthetic

14     marijuana or fake weed and therefore with respect to

15     the 4.97 kilograms of powdered synthetic cannabinoid

16     substance he opines that that should be treated as

17     if the defendant was attempting to produce this

18     product -- that is, a successful synthetic marijuana

19     product -- and since according to the DEA's

20     published ratio, 1 kilograms of powdered synthetic

21     cannabinoid substance is expected to yield

22     14 kilograms of synthetic marijuana, therefore the

23     powdered substance should be assigned a marijuana

24     equivalency ratio of 14 to 1.  I find that to be

25     convincing and persuasive.

1          And with respect to the synthetic smokeable

2     substance which is intended to mimic actual

3     marijuana, it should be treated as actual marijuana

4     with an equivalency ratio of 1 to 1.

5          It may be that other judges have come to

6     differing conclusions, but as I said earlier I don't

7     know what testimony those judges had before them,

8     whether they made credibility findings.  So as in

9     any contested evidentiary dispute, those disputes

10    are resolved based on the testimony before the trier

11    of fact.  And I don't know of any binding authority

12    in this circuit, Mr. Murray, that is contrary to my

13    findings.  And if there is any binding authority, I

14    would expect that you would bring it to my

15    attention, as would Mr. Zaremba.  Do you know of

16    any?

17         MR. MURRAY:  I do not, Your Honor.

18         THE COURT:  Mr. Zaremba?

19         MR. ZAREMBA:  Your Honor, I do not.

20         THE COURT:  I realize this may be an evolving

21    area of the law.  All I can do is attempt to

22    understand and appreciate the expert testimony

23    before me and apply it to the guidelines.

24         So I now turn to the probation office to start

25    calculating.  There was one objection, Mr. Zaremba

1      -- by the way, Mr. Zaremba's objection to the use of

2      the 167 to 1 ratio is sustained for those reasons.

3          There is a secondary objection, as I

4      understood it, and I would like you to state it so

5      the record is clear, but I understood you to object

6      to considering the full weight of the synthetic

7      cannabinoid substance.  I'll let you state that.

8          MR. ZAREMBA:  Your Honor, I think there is a

9      secondary objection that I had -- it goes to weight,

10     Your Honor, is that what --

11         THE COURT:  Yes, sir.

12         MR. ZAREMBA:  I had filed a secondary

13     objection.  I totaled up with the help of an intern

14     at my office the total weight of what we found up

15     in -- what was found up in Chicago and it was off --

16     I think they found 202 kilos, we found 197 kilos,

17     but it made no difference in terms of the

18     guidelines.

19         THE COURT:  Well, in the presentence report at

20     paragraph 12 it's reported that there were

21     4,974.65 grams of AB-FUBINACA --

22         MR. ZAREMBA:  And we don't not dispute that,

23     Your Honor.

24         THE COURT:  -- seized in the van.  I think

25     that equates to 4.97 kilograms, does it not?

1          MR. ZAREMBA:  Yes, Your Honor.

2          THE COURT:  And then in the storage unit

3     193.16 kilograms of the synthetic cannabinoids?

4          MR. ZAREMBA:  Yes, Your Honor, I believe what

5     happened is probation took my objection out when

6     they corrected the level -- the amount.  It had been

7     a higher level.

8          THE COURT:  So we're left with 193.16?

9          MR. ZAREMBA:  Yes, Your Honor.

10         THE COURT:  All right.  With respect to the

11    4.97 kilograms, that would implicate the 1 to 1

12    equivalency?

13         MR. ZAREMBA:  No, Your Honor, the --

14         THE COURT:  Or is that the 14 to 1?

15         MR. ZAREMBA:  That would be 14 to 1 on the

16    analysis.  And the 193 kilograms would be 1 to 1.

17         THE COURT:  I'm sorry, I had it reversed.  All

18    right.  Does that help, Gail?

19         PROBATION OFFICER:  Yes.  The amount that was

20    in the van, the powder, using the 14 to 1 ratio is

21    equivalent to 69.9 kilograms of marijuana.  That

22    added to the 193.16 in the storage facility is

23    263.06 kilograms of marijuana, which yields a base

24    offense level of 20.

25         THE COURT:  And now turning to page 5, instead

1      of 36, it's 20?

2              PROBATION OFFICER:  Yes, sir.

3              THE COURT:  And I'll ask you after the hearing

4      if you will I guess supplement is the word, instead

5      of the current paragraph 20 because I've sustained

6      the defendant's objections, include the explanation

7      of the conversion of the substances to the marijuana

8      equivalency.

9              PROBATION OFFICER:  Yes, Your Honor.

10             THE COURT:  Thank you.  That would result in

11     an adjusted offense level of 18; is that right?

12             PROBATION OFFICER:  Yes, Your Honor.

13             THE COURT:  And does the government move for

14     the additional level for acceptance of

15     responsibility?

16             MR. MURRAY:  Yes, Your Honor.

17             THE COURT:  That would then, applying the

18     three-level adjustment for acceptance of

19     responsibility, result in a total offense level of

20     15.

21             Are there any other objections to the

22     application of the guidelines or the contents of the

23     report, Mr. Zaremba?

24             MR. ZAREMBA:  Your Honor, in abundance of

25     caution, I may not have followed the court.  You did

1       include the two levels off for safety valve?

2              THE COURT:  Yes.  The adjusted offense level

3       is 18.

4              MR. ZAREMBA:  Right.

5              THE COURT:  That's it?  All right.  Let me

6       then, with probation's assistance, determine how the

7       guidelines apply.

8              PROBATION OFFICER:  18 to 24 months.

9       Supervised release remains the same, 1 to 3 years.

10      And the fine range is $7,500 to $1 million.

11             THE COURT:  We have a total offense level of

12      15, criminal history category I, which results in a

13      range of 18 to 24 months, followed by 1 to 3 years

14      of supervised release, fine range of $7,500 to

15      $1 million, and there is a mandatory $100 special

16      assessment.

17             Mr. Zaremba, what say you and your client?

18             MR. ZAREMBA:  Thank you, Your Honor.  I know

19      the court has read my sentencing memorandum, so I

20      will not belabor my arguments I laid out in there.

21      I would ask the court for a low end guideline

22      sentence of 18 months in this individual's

23      situation.  Based on the court's calculations, this

24      would be an adequate specific deterrent to him as a

25      general deterrent.  It fits in very well with what

1        Judge Tjoflat called just deserts.  Ultimately he's

2        going to be deported out of this country.  I would

3        ask the court for a sentence of 18 months.

4             THE COURT:  All right.  Thank you, sir.  Is

5        there anything that the defendant would like to say?

6        Just explain that he can speak to the interpreter

7        who will then interpret to me.

8             THE DEFENDANT:  I want to say that I'm very

9        sorry for what I did with the government.  I ask for

10       mercy from God and from the judge.  I have two kids

11       and I have to go back to help my kids.  If I can be

12       in jail that's closer to my home to help my kids.

13            THE COURT:  Where would that be, Mr. Zaremba?

14            MR. ZAREMBA:  Chicago, Illinois, Your Honor.

15            THE COURT:  Closest facility to Chicago?

16            MR. ZAREMBA:  Yes.

17            THE COURT:  Sorry, sir, I didn't mean to

18       interrupt.

19            MR. ZAREMBA:  No, I'm glad the court asked me

20       because I was running through my mind which jails I

21       had looked at.  I think the easiest approach is to

22       recommend the jail closest to his family.  That also

23       has UNICOR because he needs to work.

24            THE COURT:  Is there anything else, sir?

25            THE DEFENDANT:  Thank you, Your Honor.

1         THE COURT:  Thank you, sir.

2         Mr. Murray?

3         MR. MURRAY:  Your Honor, I would ask that the

4    court consider a sentence at the mid or high range

5    of the guideline range.  Given the large quantity

6    that this defendant manufactured and possessed and

7    the seriousness of the offense, I think a 24-month

8    sentence would be reasonable, given the facts in

9    paragraph 14.  He had 193 kilograms of AB-FUBINACA

10   and XLR-11.  And he was engaged in interstate

11   smuggling and transportation of those drugs, so I

12   think it's a serious offense, Your Honor, I think

13   24 months would be reasonable.

14        THE COURT:  I realize that 5K has not been

15   filed.  One may have been hoped for by the

16   defendant, there may some day be a Rule 35, I don't

17   know, but I would still like you to outline the

18   extent of the defendant's cooperative efforts to

19   date, if you don't mind.

20        MR. MURRAY:  Yes, Your Honor.  He has been

21   debriefed by Special Agent Jerale in the courtroom

22   twice, as well as by DEA agents from the Chicago

23   area.  His cooperation with respect to Tampa Bay

24   targets has not been productive, not through any

25   fault of his, but he's been shown a number of

1    photographs of suspected local co-conspirators, that

2    has not been fruitful, he's not identified anyone

3    that he was working with locally.

4         And in terms of the Chicago investigation,

5    it's our understanding their investigation is

6    already in an advanced stage so his cooperation is

7    not necessary for any indictments, although it is

8    possible they may wish to use him at trial or --

9    either as direct evidence or 404(b) evidence

10   potentially at any trials they may have down the

11   line.  But his efforts have not yielded any arrests,

12   any seizures.  Or any indictments.

13        THE COURT:  All right.  Mr. Zaremba, would you

14   like to add anything to that?

15        MR. ZAREMBA:  Your Honor, I think what

16   Mr. Murray said is accurate.  We were hopeful, all

17   the parties were hopeful that something would be

18   generated by this week.  We met with agents from

19   Chicago at the beginning of this week and we're very

20   hopeful that would be able to turn into something,

21   but not for today's purposes.

22        It would like to me at this point that the

23   Chicago cooperation may well turn itself into a

24   Rule 35.  I can't really speak to the local one,

25   though it's been attempted by my client.

1          THE COURT:  All right.  Thank you, sir.

2          Let me begin by acknowledging the sentencing

3     factors in Section 3553(a) of Title 18.  The

4     defendant's background and characteristics are set

5     forth in the presentence report and also mirrored in

6     the defendant's sentencing memorandum.  He has only

7     one blemish in his criminal history, seems to be a

8     hard-working, productive member of society but for

9     this offense.  He's been supporting his children,

10    apparently without a court order, for the right

11    reasons, to his credit.

12         He is likely to be deported as a result of

13    this conviction.  He has cooperated to the extent

14    he's debriefed twice.  He may or may not earn a

15    Rule 35, but I will certainly consider his

16    cooperative efforts to date.

17         This is a serious offense and the sentence

18    should reflect that.  These products are dangerous,

19    although as I understand it they were readily

20    available on the market several years ago -- when I

21    say "market" meaning convenience stores and smoke

22    shops and things, in some form or another.  They are

23    now prohibited.  And as both experts acknowledge,

24    they're dangerous.  Large scale interstate

25    transporting of these substances, particularly at

1    the volume this defendant was involved in, is

2    certainly a serious offense warranting a prison

3    sentence.

4         The sentence should promote respect for the

5    law as well as act as a deterrent and protect the

6    public.  I don't think this defendant necessarily

7    presents as a risk to the public, but at the same

8    time he's engaged in a serious criminal offense.

9         Having considered all these matters, it is the

10   judgment of the court that the defendant be

11   committed to the custody of the Bureau of Prisons

12   for a term of 21 months, a mid guideline range

13   sentence which I find to be sufficient but not

14   greater than necessary to achieve the statutory

15   purposes of sentencing.

16        I will recommend designation at a Bureau of

17   Prisons facility closest to Chicago and therefore

18   his family.

19        Upon completion of his prison sentence he will

20   serve a three-year period of supervised release

21   subject to the standard terms and conditions adopted

22   by this court, special condition being that if he is

23   deported, he shall not re-enter the United States

24   without the express permission of the United States

25   government.

1          This is a qualifying felony.  He is to

2    cooperate in the collection of DNA as directed by

3    his probation officer.

4          The mandatory drug testing requirements of the

5    Violent Crime Control Act are imposed.  I'll waive a

6    fine, but order that he pay the $100 special

7    assessment which is due immediately.  Of course he's

8    entitled to credit for any time in federal custody.

9          MR. ZAREMBA:  Your Honor, as to the issue of

10   credit for time in federal custody, he's been in

11   continuous custody since October 21, 2015.  I can't

12   quite gauge from looking at the PSR if it makes a

13   determination other than that.  I just want to make

14   sure he gets credit for the time he was held in

15   Chicago before he was extradited down.

16         THE COURT:  He was arrested on these charges

17   in Chicago, was he not?

18         MR. ZAREMBA:  Yes, Your Honor.  He made his

19   first appearance down here much later, three or four

20   months later.

21         THE COURT:  You agree with that?

22         MR. MURRAY:  I do, Your Honor, and it's

23   documented at paragraph 13 and the Bureau of Prisons

24   will calculate it.  I agree with what Mr. Zaremba

25   said.

1          THE COURT:  So since October 21st of 2015 he

2    gets credit.

3          MR. MURRAY:  Yes, Your Honor.

4          THE COURT:  That should be reflected in the

5    judgment, Madam Clerk.

6          Having pronounced sentence, are there any

7    objections to the sentence imposed or the manner

8    it's been pronounced, Mr. Murray on behalf of the

9    United States?

10         MR. MURRAY:  No, Your Honor.

11         THE COURT:  Mr. Zaremba?

12         MR. ZAREMBA:  No, Your Honor.

13         THE COURT:  Let me pause before I conclude and

14   express my appreciation for the efforts of the

15   lawyers in this case.  I know you're in trial --

16   Mr. Murray is in trial.

17         MR. MURRAY:  Yes, sir.

18         THE COURT:  Mr. Zaremba, are you in trial?

19         MR. ZAREMBA:  I'm not, Your Honor, I have that

20   advantage.

21         THE COURT:  I knew Mr. Murray was and we were

22   able to schedule this around that trial and I

23   appreciate that it put a burden on him that he

24   probably would just as well not have had.

25         I also want to express my appreciation for the

1    two witnesses who have been called upon to delve

2    into a matter which, as should be obvious from my

3    initial comments, has very little to do with the

4    law, more to do with chemistry and

5    pharmaceuticals -- pharmacology, excuse me.  But in

6    the context of trying to correctly apply the United

7    States Sentencing Guidelines, I believe that the

8    witnesses and the lawyers and hopefully I have done

9    our best to comply with the application notes and

10   the three-step process for calculating the most

11   closely related substance in the guidelines.

12       I shake my head because I don't know why we

13   should have to spend this much time on something

14   other than to comply with the guidelines which are

15   not binding on the court.  What's important is the

16   sentence imposed on this defendant based on the

17   offense he committed.  But I certainly appreciate

18   all the efforts and the arguments and the insight of

19   the witnesses and the lawyers.

20       Sir, to the extent permitted by your plea

21   agreement, you have 14 days within which to appeal

22   to a higher court.  You're entitled to be

23   represented by an attorney and if you're not able to

24   pay a lawyer, the court will appoint a lawyer to

25   represent you free of charge and the clerk will

1    accept your appeal without payment of the filing

2    fee.

3         Mr. Zaremba will review with you the

4    advantages and disadvantages of an appeal, including

5    the effect of an appeal upon your eligibility for

6    Rule 35 motion.  Regardless, it is your decision,

7    not his, as to whether to appeal, and you need to

8    let him know within 14 days so that he can get that

9    appeal filed, or if you choose not to appeal he can

10   confirm that with you in writing.  So listen

11   carefully to his advice and make sure that you

12   communicate your decision with respect to the appeal

13   to him.

14        Counsel, is there anything else we can address

15   this afternoon?

16        MR. MURRAY:  No, thank you, Judge.

17        MR. ZAREMBA:  No, Judge, thank you.

18        THE COURT:  Ms. Stafford, if you don't mind,

19   prepare that supplement and I would see a copy on

20   the base offense level calculation.

21        PROBATION OFFICER:  Would you like a separate

22   page calculation or amend the report and the --

23        THE COURT:  I think probably you can amend it

24   and reflect my calculations and findings.

25        PROBATION OFFICER:  We'll do that and then it

1       will be disclosed to all the parties.

2               THE COURT:  That will be fine.  Thank you very

3       much.  We'll be in recess.

4               (The proceedings adjourned at 1:52 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         C E R T I F I C A T E

2

3        STATE OF FLORIDA            )

4        COUNTY OF HILLSBOROUGH    )

5            I, Lynann Nicely, RMR, CRR, Official Court

6    Reporter for the United States District Court, Middle

7    District, Tampa Division,

8            DO HEREBY CERTIFY, that I was authorized to and

9    did, through use of Computer Aided Transcription,

10   report in machine shorthand the proceedings and

11   evidence in the above-styled cause, as stated in the

12   caption hereto, and that the foregoing pages,

13   numbered 1 through 108, inclusive, constitute a true

14   and correct transcription of my machine shorthand

15   report of said proceedings and evidence.

16           IN WITNESS WHEREOF, I have hereunto set my hand in

17   the City of Tampa, County of Hillsborough, State of

18   Florida, July 28, 2016.

19

20

21            /s/ Lynann Nicely
                 Lynann Nicely, RMR, CRR,
22               Official Court Reporter

23

24

25